TRUELOVE v. TRUELOVE et ux.

No. 6333.

Court of Civil Appeals of Texas.

Amarillo.

Oct. 26, 1953.

Rehearing Denied Nov. 30, 1953.

492

Lawing & Hazlett, Jack Alexander, Borger, for appellant.

Hood & Hood, Borger, for appellees.

PITTS, Chief Justice.

This is an appeal from a nunc pro tunc judgment duly entered denying the application of proponent, C. G. (Cliff) Truelove, to have the will of his brother V. C. (Clyde) Truelove, deceased, admitted to probate. The testator on July 15, 1946, executed the will "in duplicate originals" devising and bequeathing all of his property of every kind and character to his brother, C. G. Truelove, and named him independent executor thereof, then died thereafter on August 16, 1951, while a resident of Borger, Hutchinson County, Texas. The said will likewise contained a paragraph set out in the following language:

"I have purposely excluded all of my relatives other than C. G. True-love, my brother, named as sole devisee in this will for the reason that the said C. G. Truelove is now and has been helping to provide for the support of my father J. A. Truelove and my mother, Lottie Truelove, and will continue to provide for and support my father and mother."

The will was admitted to probate by the Hutchinson County Court on May 13, 1952, over the contest of J. A. Truelove and wife, Lottie Truelove, parents of both the testator and proponent, and an appeal was thereafter perfected to the District Court where a trial de novo was had.

The case was there tried before a jury which found that the testator, V. C. True-love, had testamentary capacity to execute the will on the date thereof but it further found that the will was executed and procured by reason of undue influence exerted upon V. C. Truelove by his said brother, C. G. Truelove, proponent herein. Thereafter the trial court announced judgment for the contestants upon the jury's answer to the second special issue finding the existence of undue influence. However, the trial court on November 7, 1952, inadvertently and contrary to its announcement and expressed intentions, signed a wrong form of judgment which, in effect, set aside such jury finding and admitted the will to probate. The erroneous judgment was duly filed and entered of record without the knowledge of contestants or their attorneys and without the trial court realizing the mistake made until on or about February 9, 1953, when a motion for the entry of a proper judgment nunc pro tunc was filed, due notice thereof given and a proper hearing had thereon with the result that the trial court set aside the erroneous judgment and the judgment first herein mentioned was signed and entered by the trial court denying the will to probate, from which judgment an appeal has been perfected to this court by proponent.

Proponent attacks the nunc pro tunc proceedings, charging error on the grounds

that such proceedings could not legally authorize the substitution of one judgment for another and that such proceeding certainly could not be legally had at a time more than thirty days after the entry of the first judgment in a trial court that holds continuous terms and at a time also long after the term of court at which the entry of the first judgment had ended. The record reflects that the case went to trial on October 1, 1952, and the jury returned its verdict on October 3, 1952. Thereafter both parties sought judgment on the jury verdict and both parties had drawn judgments, respectively, as to form, supporting their respective contentions and had presented both forms to the trial court to sign. Proponent filed a motion for judgment, urging therein that the trial court set aside and disregard the answer of the jury to the second special issue finding the existence of undue influence on the grounds that such finding had no support in the evidence and render judgment admitting the will to probate. Proponent prepared such a judgment in keeping with his motion, which was duly filed, and left the motion together with the judgment on the desk of the trial judge. These matters were duly considered by the trial judge until on or about November 5, 1952, when he in open court announced that judgment would be entered for contestants upon the jury verdict. The next day on November 6, 1952, the trial court wrote and posted a letter to counsel for both parties, receipt of which letter is acknowledged by both parties, advising that judgment would be entered for contestants denying the will to probate and urging that such a judgment in form be submitted to him at an early date. Next day the trial court made the following entry on his court docket:

" 'Nov. 7, 1952. Judgment for Plaintiffs, J. A. Truelove and wife, as prayed for as per Judgment this date and which is this date; Nov. 7, 1952, filed with the Clerk of this Court. Costs taxed against Defendant, C. G. Truelove. Defendant gave notice of Appeal to Honorable Court of Civil Appeals.
"/s/ Jack Allen
Judge Presiding.' "

On that said day the record reflects that the trial judge likewise "inadvertently and unintentionally" signed and entered the wrong form of judgment (that is, the form presented to him by proponent) contrary to the pronouncement of judgment previously made by him in open court, by letter to counsel, and by docket entry made on the same day. Upon discovery of the mistake of the court on February 7, 1953, counsel for contestants on February 9, 1953, filed a motion for the entry of a proper judgment nunc pro tunc, attaching thereto a suggestive proper form of judgment. Notice for a hearing thereon was given and such a hearing was had on February 18, 1953, with all interested parties present when the trial court sustained the motion, revoked, cancelled and set aside its erroneous judgment previously entered on November 7, 1952, and in lieu thereof entered a corrected judgment nunc pro tunc in accordance with the pronouncements previously made deny-ing the will to probate.

It is our opinion that the proceedings challenged by proponent were conducted in accordance with the rules of law governing such matters as was announced in the case of Coleman v. Zapp, 105 Tex. 491, 151 S.W. 1040, wherein the Supreme Court held that the failure to correctly or fully enter a judgment upon the Minutes of the court does not annul it but merely makes the court's record imperfect; that a court has inherent power, independent of any statute, to correct a judgment and make it speak the truth by a proper entry nunc pro tunc so as to properly recite the effect of its judgment, and that a court's jurisdiction over its judgment records does not end with the term under such circumstances as presented here, but the matter in question is regarded as pending under such circumstances until a proper judgment is correctly entered. For these reasons a proper judgment can be correctly entered without the necessity of instituting an independent suit to get such done.

The rules of law announced in the Coleman-Zapp case, supra, have since been consistently followed by our courts. In the

recent case of Knox v. Long, 257 S.W.2d 289, the Supreme Court cited that case with approval and quoted from it the rules governing a factual situation similar to the one at bar wherein the trial court had inadvertently and by mistake entered an order dismissing a case at a former term of the court when the same was properly corrected at a subsequent term of the court by the entry of its proper judgment after notice and a hearing was had. The court there cites numerous authorities in support of its action, among them being Rules 316 and 317, Vernon's Texas Rules of Civil Procedure.

■ Proponent also complains about alleged irregularities in contestants' pleadings in the nunc pro tunc proceedings, a failure to attach exhibits as pleaded and the time for hearing on the motion. However, such complaints are not well taken. It appears that all parties were aware of the issues raised, knew of the exhibits mentioned and their contents and all parties had notice of the hearing, appeared and were heard. If any error was committed, such was a harmless error as a result of which nobody's rights were prejudiced. Texas Power & Light Co. v. Hering, 148 Tex. 350, 224 S.W.2d 191, and Rules 434 and 503, Texas Rules of Civil Procedure.

Proponent further charges error was committed on the alleged grounds that there was no evidence to support the submission of an issue on undue influence to the jury or the jury finding to the effect that the will of testator was executed as a result of undue influence exerted upon testator by proponent and therefore no evidence to support the trial court's judgment based on such jury finding. According to the record neither party objected to the trial court's charge or any part thereof. In connection with the submission of the issue on undue influence the court gave the following instruction:

"You are instructed that 'undue influence' that invalidates a will is that influence which destroys the free agency of the testator and places him where he is dominated by another, and which acts directly on his mind at the time that said instrument is executed.

In this connection you are instructed that weakness of body and mind, whether produced by the infirmatives of age or by disease, may be considered as a material circumstance in determining whether the testator was in condition to be susceptible of undue influence.

"You are further instructed that undue influence can be established by circumstantial as well as by direct evidence. Opportunity to exert undue influence may be considered, but you are instructed that undue influence cannot be inferred alone from motive or opportunity, but there must be some testimony to show that undue influence not only existed but that it was exercised with respect to the making of the will."

Under these instructions and the evidence heard the jury found such undue influence was so exerted by proponent.

■ Twenty witnesses testified, some of them at length, and much of the testimony concerning the controlling issues was controverted. However, it is elementary law that, if there be sufficient evidence of probative force to support the findings of the jury, the parties to the suit and the appellate courts are bound thereby. To test the sufficiency of the evidence to determine if it will support the jury findings, we must give credence only to the evidence and circumstances favorable to the findings and disregard all evidence to the contrary, indulging every legitimate conclusion which tends to uphold such findings. Barrick v. Gillette, Tex.Civ.App., 187 S.W.2d 683; Boston Ins. Co. v. Rainwater, Tex.Civ.App., 197 S.W.2d 118, and other authorities cited by these cases.

For obvious reasons we shall now examine as briefly as possible all the evidence that may bear any relationship to the jury finding on undue influence. The record reveals that J. A. Truelove was 82 years of age and his wife, Lottie Truelove, was 78 years of age. The health of Lottie Truelove was so poor she was not physically able to attend the trial. They formerly resided in the State of Mississippi where

they reared a family of nine children consisting of three girls and six boys of which proponent was one, although not the oldest one, and testator was another and was just younger than proponent. Testator, whose first name was "Clyde", was 50 years of age when he died. He had previously moved from Mississippi to Borger, Texas, in 1927 where he actively engaged in business and became fairly prosperous until he began the excessive use of alcoholics, which seriously affected his health. He was married for about a year about 1930 or soon thereafter but the record does not reflect anything further about his marital status or any heirs or descendants as a result of such marriage. According to the record he was never married again. In 1930 testator's sister, Miss Girtha Truelove, about nine years younger than testator, moved from Mississippi to Borger, Texas, and did secretarial work until she married Albert Gamble in 1938. From the time she came to Borger, Texas, she was closely associated with her brother Clyde until his death. Contestants herein, Clyde's parents, moved to Borger, Texas, in 1942, since which time they were also closely associated with Clyde, who owned and operated a grocery store in Borger with his father assisting him in the management thereof.

Among the witnesses who testified were two of the testator's family physicians, who resided in Borger where they practiced but they were not associated together professionally. Dr. W. G. Stephens testified that he had observed and treated testator often from 1940 or 1941 until his death for heart and liver trouble, particularly the last four or five years prior to his death; that testator was an alcoholic who weighed 230 or 240 pounds. He would not obey orders or quit drinking. Alcohol poisoned his system until it affected his mind so badly that he (the witness) had the family take testator to a mental institution in San Antonio in 1945 or early in 1946 for observation and treatment. Such helped him little if any. After testator's return from the San Antonio mental institution the witness continued to treat him and see him often. During the summer of 1946, particularly in

June of that year, testator suffered intensely because of cirrhosis of the liver from alcoholism, which necessitated keeping him locally hospitalized for some time, during which period of time he tapped testator's abdomen several times and removed therefrom large quantities of fluid. Because of his physical condition his body became poisoned with toxemia from accumulated toxic poisons to such an extent his mind became affected causing him to be delirious and have hallucinations, be irrational, have no mind and suffered with illusions that somebody was trying to beat him out of his property; that testator became so violent that he had to be kept in a strait jacket and restrained a part of the time for his own protection; that because of his weakened mind he was irrational most of that period of time. The witness recommended that testator be taken to a mental hospital in Denver, Colorado, and he did go there in July of 1946. The witness saw testator the day before he went to Denver and his physical and mental conditions were bad. He likewise saw him soon after he returned from Denver and his condition was no more than slightly improved, if any. Testator did not have much will power at any time. He would improve some while in the hospital but would continue his drinking as soon as he had an opportunity, causing more physical and mental troubles of a progressive nature until he died.

The testimony of Dr. H. M. Hamra, the other family physician, corroborated fully that given by Doctor Stephens. Doctor Hamra testified also that he treated testator periodically from 1945 until his death and that testator was an alcoholic, which caused cirrhosis of the liver from which trouble his mind was affected until he could not think coherently or carry on an intelligent conversation. This witness also tapped the abdomen of testator periodically to draw fluid therefrom caused by his liver condition. He likewise had the family send testator to mental institutions for observation and treatment, one of them being a clinic at Shattuck, Oklahoma. The physical and mental condition of testator was bad during the summer of 1946.

Much of the medical testimony was corroborated by that given by lay witnesses, including members of testator's immediate family. The testimony of contestant, J. A. Truelove, his daughter, Mrs. Girtha Gamble, and her husband, A. S. Gamble, fully corroborated the medical testimony and they had been more closely associated with testator than anybody else during the most of his life and particularly during his illness the last few years before his death. They had the responsibility of looking after testator and helping to operate his grocery store during his long illness. They each testified that testator had told them many times, prior to the date the will was executed and subsequent thereto, that he would leave all his property to contestants, his parents, should he precede them in death; that none of them knew anything about testator executing a will until he was dead and buried when proponent produced the will and merely told them that Clyde had left him all of his property; that proponent had not discussed with any of them any plans he had made to care for his parents, contestants, in accordance with a provision found in the will; that there had never been any friction or bad feeling between testator and his parents, although his parents did not approve of his excessive use of alcoholics and some of his other bad habits. Contestant, J. A. Truelove, further testified that Clyde and Cliff were never any closer to each other than any other two of his children; that proponent had never helped to support him and his wife (proponent's parents) at any time either before or after the will was executed; that proponent's wife would not live in the house with them when they went back to Fulton in 1945 and lived for a time in the house with proponent; that she left home for a period of more than 3 weeks and they moved out and into their own little farmhouse as soon as they could; that during the time they lived with proponent they helped to bear the living expenses and helped proponent with the farm labor and other work.

Proponent, C. G. (Cliff) Truelove, testified that he was 53 years of age and had lived in Fulton, Mississippi all of his life where he owned and operated a small farm; that he visited his brother Clyde one, two or three times after he moved to Texas and Clyde visited him several times; that his parents, contestants, moved from Fulton to Borger, Texas, about 1940; that they came back to Fulton in 1945, and stayed about a year; that they first lived with him when they came back but later moved to themselves; that his wife left their home when his parents came and was gone "some twenty-odd days" before she returned; that his sister, Mrs. Girtha Gamble, wrote him that Clyde was very ill and the doctors said he may die any time and for him to come at once; that he and his wife came at once, arriving in Borger on June 29, 1946, and stayed two or three weeks; that upon his arrival, his said sister told him about Clyde's condition, treatment given him, what the doctors had said about him and about him being hospitalized at different places and times; that during his visit he was with Clyde constantly all day every day and until midnight every night; that he and his wife went with Clyde to a mental hospital in Denver, Colorado, on July 9 or 10 where he stayed three or four days; that on the next day after they returned from Denver, without saying anything about it to any other member of the family, he alone, went with Clyde on July 15, 1946, to the office of J. O. Ward, a local attorney residing in Borger, where J. O. Ward drew Clyde's will being here contested and the same was there executed on the same day with J. O. Ward and his daughter, who was Ward's secretary, witnessing the will; that he was present with Clyde and Ward during all the time the terms of the will was being discussed and when the will was being drawn and when it was executed in the presence of the four persons named and no others; that J. O. Ward died soon thereafter; that he (proponent) kept a copy of the will and never mentioned the matter of Clyde's making a will to any members of the Truelove family during that visit to see them and did not tell his wife about it until they were on the road home some two or three days after the will had been executed; that he did not visit Clyde any more but came home for Clyde's funeral and did not mention the

will to any of the family until after Clyde was buried when he then told his father, J. A. Truelove, one of the contestants; that he had never discussed with his parents since the will was made about his taking care of them and had never made and disclosed to them or any of the brothers or sisters any plans or arrangements he had made for supporting them or caring for them; that he has never helped his parents since he married about 1928 except for letting them live with him for a short time in 1945; that he never did write his parents but his wife wrote them occasionally; that Clyde had helped their parents some; that Clyde and their parents, contestants herein, were always very close to each other; that he did not visit their parents or his sister, Mrs. Gamble, while there attending the trial, although he and his wife stayed in the home of his said sister when they made the visit in 1946; that he knew his parents would be Clyde's sole heirs without the execution of a will by Clyde; that his mother's health was failing.

The rule of law governing such a question as is here presented has been well stated in the following language:

"The existence of undue influence is a question of fact, and from its very nature, like all fraudulent and vicious schemes, hides its features behind masks and operates in dark and secret places and in covert ways, and proof of it must usually be by circumstantial rather than by direct testimony. Those circumstances may be the condition of the testator's mind, his age, weakness, and infirmity, his surroundings and the circumstances attending the execution of the will, the opportunity for the exertion of such influence as would trammel or destroy the exercise of free agency in the disposition of the property, the words and acts of testator and beneficiary, the existence of confidential relations between them, and the injustice, unreasonable and unnatural character, of the will. Rollwagen v. Rollwagen, 63 N.Y. 504; Woodbury v. Woodbury, 141 Mass. 329, 5 N.E.

275, 55 Am.Rep. 479; Bryant v. Pierce, 95 Wis. 331, 70 N.W. 297; In re Barney's Will, 70 Vt. 352, 40 A. 1027; Marx v. McGlynn, 88 N.Y. 357; Smith v. Smith, 60 Wis. 329, 19 N.W. 47." Holt v. Guerguin, Tex.Civ.App., 156 S.W. 581, 584, affirmed as to the rules here cited, 106 Tex. 185, 163 S.W. 10, 50 L.R.A.,N.S., 1136.

The rule of law above quoted has since been consistently cited with approval by our courts in cases such as the one at bar. Particularly was it cited in a case similar to this wherein a will had been admitted to probate in a county court but probate denied in a district court upon a trial de novo when the court used the following language:

"'It is generally true that the exercise of undue influence in procuring the execution of a will can only be shown by circumstances. Direct evidence of such fact is rarely ever obtainable * * *.' In determining this question, 'All of the circumstances shown by the evidence should be considered, and even though none of the circumstances standing alone would be sufficient to show undue influence, if when considered together they produce in the ordinary mind a reasonable belief that undue influence was exerted in the procurement of the will, they are sufficient to sustain such conclusion.' Mayes v. Mayes, Tex.Civ.App., 159 S.W. 919, 922; Russell v. Boyles, Tex. Civ.App., 29 S.W.2d 891; Holt v. Guerguin, Tex.Civ.App., 156 S.W. 581." Barksdale v. Dobbins, Tex.Civ.App., 141 S.W.2d 1035, 1038, writ refused.

In the case of Pullen v. Russ, Tex.Civ. App., 209 S.W.2d 630, 634, this court recognized with approval the following rule:

"It has been held that the opportunity to exert such influence, the age of the testator, his physical condition, the fact he preferred one child over another, and the original testamentary intentions of the deceased are circumstances which, if taken alone, would not necessarily be evidence of undue

influence. However, when taken in the same case and when the devise is either unnatural or, to say the least, contrary to the testator's previously announced intentions, such combined facts and circumstances are, sufficient to take the issue of undue influence to the jury. Russell v. Boyles, Tex.Civ.App., 29 S. W.2d 891, error dismissed."

However, in that case this court held that the evidence there presented failed to meet the test required by our courts, but in this case the record reflects a different factual situation.

In the case of Long v. Long, 133 Tex. 96, 125 S.W.2d 1034, a contested will was admitted to probate in the county court but the district court denied the will to probate when the jury found that the testatrix possessed testamentary capacity to execute the will but that the will was procured as a result of undue influence, just as the jury found in the case at bar. The Court of Civil Appeals, 98 S.W.2d 236, reversed and rendered the case in favor of the proponents on the alleged grounds that the evidence was insufficient to support the jury finding of undue influence. A writ of error was granted by the Supreme Court, which held that, taking the case as a whole, there was enough evidence, together with the existing circumstances, to raise a fact issue on the question of undue influence, thus supporting the jury finding and the trial court, and remanded the case to the Court of Civil Appeals with instructions accordingly. 133 Tex. 623, 138 S.W.2d 798.

In the case at bar the following facts and circumstances are overwhelmingly established: proponent and testator were not attached to each other nor more closely associated with each other than any of the other children of contestants; that proponent had not materially helped his parents since he married in 1928 either before or after the will was executed five years before testator died, and certainly had not helped his parents as much as testator had or even as much as his sister, Mrs. Girtha Gamble, had; that proponent knew soon after he came home on June 29, 1946, to visit Clyde that his said brother was very sick both physically and mentally by reason of his alcoholic habits and had recently spent several weeks in a local hospital and in a mental hospital at San Antonio for observation and treatment and that two local family doctors had been treating Clyde for years and had pronounced him seriously ill and mentally unbalanced; that the doctors had told the family that Clyde would not likely live much longer and proponent knew of such reports; that proponent stayed with testator constantly during his visit, during which time proponent and his wife alone went with testator to another mental hospital in Denver where he was observed and treated for his physical and mental condition; that the next day after they returned from Denver, proponent, without mentioning the matter to any of the other relatives, with whom he and his wife were staying during that lengthy visit and among all of whom the best of feeling then existed, went alone with Clyde to the office of a lawyer where the will in question was ordered drawn in the form reflected with nobody present but proponent, testator and the lawyer; that the will was then typed by the lawyer's daughter as secretary and immediately thereafter executed in the presence of these four designated persons and no other; that proponent and testator returned to continue the family visit together with other members of the family for two or three days before proponent and his wife left for their return trip home in Mississippi, but no mention was ever made then or later to the other members of the family about Clyde having executed a will until after he was buried; that proponent did not even divulge such information to his wife until they were far along the road home on their return; that testator and the said lawyer have both died since the will was executed, leaving none of the three but proponent to testify about what was said and done in the discussion concerning the preparation of the will and he threw little, if any, light on the matter by his testimony and the secretary who typed the will and witnessed it knew nothing about the discussion between her father and the parties who had the will drawn; that proponent knew testator's es-

tate would all be left to contestants herein, their parents, under the law of descent and distribution if Clyde did not execute a will; that testator had often told his parents and other members of the family, both prior to and subsequent to the date the will was executed, that he would leave his property to his parents, contestants herein, if he should precede them in death; that proponent had, at least, a copy of the will from the date it was executed, if not in fact the original will itself, since he produced the will and exhibited it to his father and brother-in-law immediately after testator was buried and on the same day of the burial without any way explaining as to how it came into his possession; that proponent has not since discussed with the family or announced any plans made by him as to how he would care for his parents; that the statement made in the will to the effect that proponent was then helping to provide support for his parents and would continue to do so was refuted by the evidence.

Because of all of these facts and circumstances, it appears from the record that the jury was justified in finding and concluding that testator, who had little will power and who had unquestionably been weak and mentally unbalanced immediately prior to the execution of the will, if not in fact partially so at the very instance the will was executed, either from fear of his older brother, proponent, or through a desire for full peace and harmony with his said brother at the said time, or as a result of some other feeling of a similar nature which he was unable to resist, felt compelled to execute the will in question to please his brother, contrary to his own good intentions and normal convictions, both previously and subsequently expressed, to leave his property to his parents if he should precede them in death, just as he had often told his parents and other members of the family he would do.

Proponent is insisting that the jury finding concerning the issue of undue influence should be overturned, set aside and disregarded on the grounds that there was no evidence to support such finding. We find from the record there is some competent evidence, together with pertinent circumstances, to support the jury finding. In determining whether or not such evidence, together with existing circumstances, will support the jury finding, we must observe the following well established rules of law, namely: (1) every intendment from the evidence must be indulged in favor of the jury finding; (2) only testimony which tends to support the finding can be considered; and (3) conflicts must be disregarded and the testimony must be considered in a light most favorable to the finding. City of Austin v. Salazar, Tex.Civ. App., 241 S.W.2d 445.

Viewing the competent evidence, together with the pertinent circumstances, as reflected by the record, in a light most favorable to the jury verdict on the issue of undue influence, and under the rules of law previously cited, we believe there was sufficient evidence of probative force to support the jury finding in question and the judgment of the trial court based thereon. Proponent's points to the contrary are therefore all overruled and the judgment of the trial court is affirmed.