Mary Josephine WOOD et al., Appellants,

v.

Henry S. PAULUS, as Independent Executor and Trustee of and under the Will of Annie C. Paulus, Deceased, et al., Appellees.

No. 878.

Court of Civil Appeals of Texas, Corpus Christi.

May 15, 1975.

Rehearing Denied June 12, 1975.

Carl L. Ray, Tabor & Ray, Houston, for appellants.

Armond G. Schwarz, Hallettsville, Clark Murray, Floresville, Mary C. Philley, Houston, Kenneth Oden, Alice, Newton M. Crain, Jr., Crain, Winter, Houser & Deaton, Houston, for appellees.

## OPINION

YOUNG, Justice.

This case primarily concerns the attempt to share under a will by one (Mary Josephine Wood) who claims to be the granddaughter of the testatrix (Annie C. Paulus) where the legitimacy of the purported granddaughter is challenged by the other beneficiaries.

In the trial court, before a jury, Mary contended that she was a daughter of Annie's son, Claude N. Paulus; that she was qualified to share because of this provision of the will:

". . . to Henry S. Paulus one-fourth (¼) of my estate to be held in trust by him for any lawfully begotten children of my son Claude N. Paulus, born after my death, but in case he should die without leaving any living children begotten in lawful wedlock after my death, then in that event such one-fourth part of my estate is herein bequeathed [to a child and other grandchildren] . . ., but the income thereof is to be paid to Claude . . .".

At the conclusion of all the evidence, the trial court granted the motion of the opponents of Mary to withdraw the case from consideration of the jury; the court thereafter rendered judgment for the opponents. A similar motion by Mary was denied by

the trial court. She and her assignee-attorneys appeal.

Annie C. Paulus, testatrix, died July 2, 1947. Thereafter, Mary was born September 12, 1947. Subsequently, Claude N. Paulus, Mary's purported father, died June 2, 1971. From the time of Mary's birth until the summer of 1971, no one raised any questions about Mary's qualification to take under Annie's will. During the time after Claude's death and a few days before July 12, 1971, Henry S. Paulus, independent executor of Annie's will, received information which caused him to doubt Mary's qualification to take. This information was furnished by Lilla Connor Paulus, the mother of Mary and the purported last wife of Claude.

Henry S. Paulus, as independent executor and trustee under the will of Annie C. Paulus, deceased, filed suit in Lavaca County, Texas for an order enjoining Mary Josephine Wood and her assignees, Carl L. Ray, M. Jack Tabor, and Tabor & Ray, from prosecuting certain suits previously filed in the courts of Harris County, Texas; for a construction of the will of Annie C. Paulus, deceased; for removal of cloud from title to certain real property; and for a declaratory judgment.

Mary answered that suit and filed a cross-action alleging that she is the devisee of one-fourth of the estate of Annie and requesting that Henry be ordered to pay over to her that portion of the estate.

Elton B. Hale, individually and as independent executor of the estate of Edwin Hale; Velma Hale Schneider; Rose Cyrene Crain; Dawn Paulus Hoffman; Annie Cyrene Smith; David A. Paulus; Elizabeth Paulus McKenzie; Catherine Q. Hightower; Andrew H. Paulus; Joe Vaughn Hotchkiss; Marjorie Paulus Murray; and Lilla Conner Paulus, individually and as temporary administratrix of the estate of Claude N. Paulus, deceased, were named as party defendants in the petition of Henry. It is apparent that they are similarly aligned with Henry.

Appellants contend that Mary qualifies under the will of Annie.

Appellees contend that, as a matter of law, Mary is not qualified to take under Annie's will for the following reasons:

1. The term "begotten" means conceived. The undisputed evidence shows that Mary was conceived before the death of Annie. The will requires that Mary be conceived after Annie's death.

2. There is no evidence of a marriage between Claude N. Paulus and Lilla Conner Paulus because:

A. It is undisputed that Lilla was pregnant with Mary before she ever met Claude.

B. The purported marriage license introduced into evidence was irregular and invalid on its face.

C. Such license was inadmissible because it does not comply with Vernon's Tex.Rev.Civ.Stat.Ann. art. 3731a (Supp. 1974).

D. There is an impediment to any purported marriage between Claude and Lilla because Claude is still married to Mildred Paulus. Thus, Mary could not have been begotten in lawful wedlock.

Appellants' first and second points of error argue different phases of the same issue: validity of the marriage of Claude and Lilla.

■ Since we are dealing with a directed verdict granted in favor of appellees, we will look only to that evidence which supports appellants' position and accept such as true. Adams v. Slattery, 156 Tex. 433, 295 S.W.2d 859 (1956); Walter E. Heller & Company, Inc. v. Allen, 412 S.W.2d 712 (Tex.Civ.App.—Corpus Christi 1967, writ ref'd n. r. e.). The issue before us is whether appellees are entitled to judgment as a matter of law. Walter E. Heller & Compa-

ny, Inc. v. Allen, supra; Harvey v. Elder, 191 S.W.2d 686 (Tex.Civ.App.—San Antonio 1945, writ ref'd).

It is appellants' contention that Lilla, the natural mother of appellant Mary, was lawfully married to Claude on November 10, 1946; that they were lawful husband and wife when Mary was born; and that Claude was the biological father of Mary. Appellees contend to the contrary. In support of their contention, appellees introduced various documents into evidence in an attempt to show that a prior marriage between Claude Paulus and Mildred Gore had never been terminated. Some of the documents are these:

1. Appellees' exhibit # 9 is the petition of Claude N. Paulus seeking a divorce from Mildred Paulus. It was filed March 18, 1926.

2. Appellees' exhibit # 12 is a record of the filing fees in the 1926 divorce action. This document indicates that some of the fees were paid. It contains a rubber stamp marking which indicates the action was dismissed for want of prosecution "10–29–27". The document also bears a handwritten notation that judgment for divorce was entered nunc pro tunc as of December 6, 1926. This notation was dated "10–22–45". This instrument does not bear the signature or initials of the judge.

3. Appellees' exhibit # 8 is the docket sheet for the court of the 55th Judicial District. This docket sheet bears a rubber stamp marking on it that indicates that the cause was dismissed for want of prosecution, 10–29–1927. A second handwritten entry, dated 10–22–45, states "Dismissal set aside & Judgment nunc pro tunc Dec. 6, 1926 entered". This docket sheet is not signed by the judge. Exhibit # 8 also contains a list of cases dismissed for want of prosecution. This blanket dismissal is not signed by the judge.

4. Appellees' exhibit # 7 is a motion for entry of decree of divorce nunc pro tunc and the judgment entered thereon. The judgment recites that, after hearing evidence on the motion and upon examination of the court's personal records, the court did in fact grant a divorce to Claude N. Paulus on December 6, 1926. The court then entered judgment nunc pro tunc on October 22, 1945. That judgment recites that Mildred Paulus filed written waiver of citation but did not personally appear.

Appellees contend that the judgment nunc pro tunc was void. They contend that the court attempted to modify its judgment of dismissal through the device of a nunc pro tunc judgment.

Generally, there should be no entry of a judgment nunc pro tunc unless evidence is adduced to show that the court did, in fact, announce or render the judgment which the nunc pro tunc judgment purports to evidence. If the court were merely correcting its records to make them accurately reflect the judgment it in fact previously rendered, it was empowered to do so because it had continuing jurisdiction over its records. Knox v. Long, 152 Tex. 291, 257 S.W.2d 289 (1953); Zamora v. Salinas, 422 S.W.2d 249 (Tex.Civ.App.—Corpus Christi 1967, writ ref'd n. r. e.); Truelove v. Truelove, 266 S.W.2d 491 (Tex.Civ.App.—Amarillo 1953, writ ref'd). It has been held that whether the trial judge pronounced the judgment orally from the bench and what the terms of the pronouncement were are questions of fact. Mobley v. Rheem Manufacturing Company, 410 S.W.2d 320 (Tex.Civ.App.—Houston 1966, writ ref'd n. r. e.); Dillon v. Nall, 99 S.W.2d 349 (Tex.Civ.App.—San Antonio 1936, writ dism'd); Reavley, Trial Court's Power to Amend its Judgments, 25 Baylor L.Rev. 191 at 203 (1973). This same rule applies to this case wherein the nunc pro tunc judgment recites that the trial judge found from his personal records

that he did grant a divorce to C. N. Paulus from Mildred Paulus on December 6, 1926.

▮ Tex.Rev.Civ.Stat.Ann. art. 3726a (Supp.1974) provides that final judgments of courts of record of this state are admissible in suits involving title to real estate as evidence of family history. The judgment nunc pro tunc recites that the court upon hearing evidence and upon examination of the court's personal records, found that it had granted a divorce to Claude N. Paulus and Mildred Paulus on December 6, 1926. An entry nunc pro tunc may be made at a subsequent term on the personal recollection of the judge. Such recollection has the dignity and force of evidence. Ft. Worth & D. C. Ry. Co. v. Roberts, 98 Tex. 42, 81 S.W. 25 (1904); Blum v. Neilson, 59 Tex. 378 (Tex.Sup.1883); Kluck v. Spitzer, 54 S.W.2d 1063 (Tex.Civ.App.—Waco 1932, no writ); Parnell v. Barron, 261 S.W. 529 (Tex.Civ. App.—Amarillo 1924, no writ); S. W. Slayden & Co. v. Palmo, 90 S.W. 908 (Tex.Civ. App.—1905 aff'd 100 Tex. 13, 92 S.W. 796).

▮ Since the title to land devised under the will of Annie is in issue, the nunc pro tunc judgment was admissible as evidence of the truth of the recitations contained therein. Thus, there is some evidence that the court did in fact grant Claude Paulus a divorce from Mildred Paulus on December 6, 1926.

Assuming, arguendo, that appellees' contention that the nunc pro tunc judgment is void is correct, appellees have still failed to meet their burden of proof. There is some evidence that Claude and Lilla entered into a ceremonial marriage relationship. Appellants' exhibit # 1 purports to be a certified copy of a marriage certificate evidencing the marriage of Claude N. Paulus and Lilla Paulus. Attached to this copy are various certifications of various signatures. The only one of these certificates which is material here is that of Ramon Meade, Consul of Mexico.

▮ The certified copy of the marriage license was attested to by Carmen Baez Duran, Officer of the Civil Registry of the City of Atizapan de Zaragoza, Republic of Mexico. Mr. Duran attested that the original marriage certificate was under his care. This attestation comports with the requirement of article 3731a, § 4, supra, that the copy be attested "by the officer having legal custody of the record . . . ."

Accompanying the certified copy is a certification by Mr. Ramon Meade, Consul of Mexico at Houston, that the certified copy of the marriage certificate bears the signature of the Officer of the Civil Registry of the City of Atizapan. Mr. Meade further certified that said officer has legal custody of the original of the marriage certificate.

Appellees contend that the certificate by Mr. Meade does not comply with article 3731a § 4. They insist that the officer making the certificate must be an officer of the United States of America. We do not agree. The sentence in question states:

"If the office in which the record is kept is in a foreign state or country, the certificate may be made by a secretary of embassy or legation, consul general, consul, vice consul, or consular agent *or by* any officer in the foreign service of the United States, *or by* any officer of a United States military government, stationed in a foreign state or country in which the record is kept, and authenticated by the seal of his office." (Emphasis supplied.)

▮ At the outset, we recognize that every word in a statute is presumed to have been used for a particular purpose. Perkins v. State, 367 S.W.2d 140 (Tex.Sup.1963); Eddins-Walcher Butane Company v. Calvert, 156 Tex. 587, 298 S.W.2d 93 (1957). The sentence in question permits a certificate to be made by a "secretary of embassy or legation, consul general, consul, vice consul, or consular agent *or by* any officer in the foreign service of the United States. . . ." The word "or" is disjunctive. It expresses an alternative. Gilbert v. Gilbert,

145 Tex. 114, 195 S.W.2d 936 (1946); Board of Insurance Commissioners of Texas v. Guardian Life Insurance Company of Texas, 142 Tex. 630, 180 S.W.2d 906 (1944); American National Insurance Company v. Wilson State Bank, 480 S.W.2d 296 (Tex. Civ.App.—Amarillo 1972, no writ). Certification "by any officer in the foreign service of the United States" is an alternative method of certification. It is apparent that the legislature of this state intended that the required certificate could be made by Mr. Meade who is consul of the Republic of Mexico, where the original marriage certificate is kept. The purpose of article 3731a is to give credence to official documents so that they may have value as competent evidence and may be relied upon. Moody v. Moody, 465 S.W.2d 836 (Tex.Civ.App.—Corpus Christi 1971, writ ref'd n. r. e.; cert. den. 406 U.S. 911, 92 S.Ct. 1605, 31 L.Ed.2d 823). There is nothing in the certification of a Mexican document by the Consul of Mexico in Houston, Texas, which detracts from the credibility of the document. Indeed, Fed.R.Civ.P. 44(a)(2) permits such a certification.

To adopt appellees' construction of article 3731a, we would be forced to disregard the disjunctive "or" in the sentence in question. We will not so do.

■ Appellees also attack the validity of the marriage certificate on the ground that it was issued on a Sunday. The certificate does not state the date of issuance. It recites that the ceremony was performed on November 10, 1946. Claude and Lilla were, therefore, married on a Sunday; not issued a certificate of marriage on Sunday. The trial court properly admitted the certified copy of the marriage certificate. We hold that this marriage certificate is some evidence of a ceremonial marriage entered into between Claude N. Paulus and Lilla Seay on November 10, 1946.

Further evidence of a valid marriage between Claude and Lilla Paulus on November 10, 1946, is appellants' exhibit # 25.

This document is a certified copy of a joint affidavit of Henry S. Paulus (who took a contra position at the trial) and J. F. Bozka. The affidavit states that both affiants had known Claude Paulus for 40 years and each knew that Claude and Lilla Paulus were married on or about November 10, 1946, and that Mary is the only child of that marriage. There were no objections to the admission of this document into evidence.

■ This affidavit was admissible under article 3726a, supra, which provides that in suits involving title to real estate an affidavit which concerns the family history, genealogy, marital status, or heirship of a decedent is admissible in evidence if, for five or more years, it has been filed or recorded in the office of a district or county clerk located in the county in which the suit is pending or in which the land is located.

As previously noted, this suit involves title to certain real estate and the suit is pending in Lavaca County. The affidavit refers to matters of the family history of Annie: the marriage of her son, Claude, and the birth of a grandchild of Annie. Therefore, the affidavit, having been filed for record September 18, 1948, with the County Clerk of Lavaca County, Texas, was properly admitted in evidence.

■ There is also evidence of an informal marriage between Claude and Lilla. Lilla admitted at the trial that she claimed to be Claude's wife when she consulted a Dr. Johnson on February 16, 1947. She also testified that she and Claude started living together as husband and wife in June of 1947; that they held themselves out to the public as husband and wife as early as June 1947. This testimony is some evidence of the existence of an informal marriage before Mary was born. Tex. Family Code Ann. § 1.91, V.T.C.A. (1975).

■ It is well settled that where two or more marriages of a person are alleged, the most recent marriage is presumed to be valid as against each marriage which pre-

cedes it until one who asserts the validity of a prior marriage proves the continuing validity of the prior marriage. Tex. Family Code Ann. § 2.01 (1975); Texas Employers' Insurance Association v. Elder, 155 Tex. 27, 282 S.W.2d 371 (1955); O. Speer, Marital Rights in Texas § 20 (4th Ed. 1962).

This presumption is one of the strongest known to the law. The Supreme Court, in Texas Employers Insurance Association v. Elder, supra, held:

". . . 'The presumption is, in itself, evidence, and may even outweigh positive evidence to the contrary. The strength of the presumption increases with the lapse of time, acknowledgments by the parties to the marriage, and the birth of children; and the fact that the legitimacy of a child may be involved is a factor in sustaining the validity of the marriage.' 55 C.J.S. Marriage § 43, pages 892–893."

See also Watson v. Todd, 322 S.W.2d 422 (Tex.Civ.App.—Fort Worth 1959, no writ).

■ It is significant that more than 25 years have passed since the parties agreed to be married. Two children were born during this period of time, of which only one (Mary) survives. Lilla lived as the wife of Claude until his death. Until Claude died none of the Paulus family questioned the legitimacy of Mary or that Claude was her natural father. The presumption is strengthened by these factors.

■ The party attacking the validity of the marriage must introduce sufficient evidence, standing alone, to negate the dissolution of the prior marriage. Simpson v. Simpson, 380 S.W.2d 855 (Tex. Civ.App.—Dallas 1964, writ ref'd n. r. e.); Dockery v. Brown, 209 S.W.2d 801 (Tex.Civ. App.—El Paso 1947, no writ). When the party alleging the invalidity of the latter marriage has introduced evidence which of itself negatives a prior dissolution of the marriage, the weight of such evidence is a question for the jury. Simpson v. Simpson, supra.

■ Assuming, arguendo, that the marriage between Claude Paulus and Mildred Paulus was not terminated as of December 6, 1926, we believe appellees have failed to show that Claude did not obtain a divorce in some other proceeding in Harris County or elsewhere before his marriage to Lilla. Having failed in this, appellees have not rebutted, as a matter of law, the presumption of validity which has attached to the marriage of Claude and Lilla Paulus. Davis v. Davis, 521 S.W.2d 603 (Tex.1975); Caruso v. Lucius, 448 S.W.2d 711 (Tex.Civ. App.—Austin 1969, writ ref'd n. r. e.). Appellants' first and second points of error are sustained.

By their third point of error, appellants complain that the trial court erred in finding as a matter of law that Mary was not entitled to take anything under Annie's will, because there were issues of fact which must be resolved. This point is vague. The argument under this point of error does not explain the point which appellants seek to put before this Court.

When we look at appellees' reply to appellants' third point of error, it appears to us that the only remaining aspect of the case not ruled upon in our discussion of appellants' first and second points of error is the assertion that Mary was not a "lawfully begotten" child of Claude "born after" the death of Annie. The pertinent paragraph of Annie's will has been set out in part by us in the forepart of this opinion. Appellants contend that "begotten" means "born". To the contrary, appellees contend that the term "begotten" means "conceived". Appellees further contend that the will requires that Mary be conceived after the death of Annie.

■ The primary concern of this Court is the determination of the testatrix's intent and the effectuation of that intent as far as is legally possible. Sellers v. Powers, 426 S.W.2d 533 (Tex.Sup.1968); Haile v. Holtzclaw, 414 S.W.2d 916 (Tex.Sup.1967).

■ Obviously born does not mean begotten, but begotten or beget may mean born. See 10 C.J.S. *Beget* (1938). *Webster's New International Dictionary* (1968) describes beget as "b: to give birth to." To adopt appellees' interpretation of this term "begotten" would require us to place a strained and unreasonable meaning upon that term. It would inject great uncertainty upon the rights of parties to take under the will due to the uncertainty of determining the date of conception. We, therefore, hold that the term "begotten" as used by Annie C. Paulus, deceased, means "born". The term "lawful" necessarily implies that which is sanctioned by law. Thus, the will requires that the children of Claude Paulus be born in wedlock sanctioned by law. This necessarily includes informal marriages sanctioned by the Family Code. In this respect, appellants' third point of error is sustained.

■ Appellants' fourth point complains that the trial court erroneously permitted appellee-Lilla to give testimony which contradicted her prior admission of a fact. We need not discuss this point. Since this is an appeal from an instructed verdict, we do not consider evidence contrary to appellants' position in disposing of this case.

Appellants' fifth point complains that the trial court erred in refusing to admit appellants' exhibits # 5 through # 12 and # 14 into evidence. These documents are pleadings and orders of courts of record of this state. It is appellants' contention that these documents are prima facie evidence that Mary Josephine Wood is a lawfully begotten child of Claude N. Paulus, born after the death of Annie C. Paulus, begotten in lawful wedlock.

■ Appellants' exhibits numbered 5, 7, 9, 10 and 12 are pleadings and a final accounting in prior legal proceedings. These proceedings deal with the guardianship of Mary Josephine Paulus (Wood). Pleadings in prior actions are not evidence of the facts stated therein. Neblett & Norman v. Goukas, 40 S.W.2d 1113 (Tex.Civ. App.—Austin 1931, no writ). See also 23 Tex.Jur.2d, Evidence § 146 (1961). These documents are clearly not admissible under articles 3726a nor are these documents admissible under articles 3731a, supra. They were not "made by any officer of this State or any governmental subdivision thereof . . .".

■ Appellants' exhibit # 6 is an order of Harris County Court appointing Claude N. Paulus Guardian of the estate of Mary Josephine Paulus (Wood). The judgment does not recite the relationship of Claude or Lilla to Mary, nor does it recite the nature of the estate of Mary. This document is neither relevant nor material to the issues of this case and was properly excluded by the trial court.

■ Appellants' exhibit # 14 is an order by the county court of Lavaca County. This order decrees that Mary qualifies under Annie's will and it allowed funds belonging to the estate of Annie to be expended in medical expenses of Mary. Appellees contend that this order is void because the county court had no authority over the independent executor of the estate of Annie. This contention appears to be correct. The county court sitting in probate has only that jurisdiction conferred upon it by the Texas Probate Code. State of Texas v. Traylor, 374 S.W.2d 203 (Tex. Sup.1963); also Tex.Pro.Code Ann. § 145, V.A.T.S. (1956). The purpose of section 145 of the Probate Code is to free the independent executor from the control of the court, except where the Code specifically and explicitly provides otherwise. Bunting v. Pearson, 430 S.W.2d 470 (Tex.Sup.1968). Appellants have shown no statutory authority of the Lavaca County Court to issue the order exemplified by their exhibit # 14.

■ Appellants' exhibit # 8 is an order granting Claude N. Paulus as guardian of the estate of Mary Josephine Paulus

(Wood), authority to execute an oil and gas lease upon the undivided ¼ interest of Mary in certain land. The order does not recite the origin of appellant-Mary's title. The land, however, is apparently part of the estate of Annie C. Paulus, deceased, which was devised under her will. This document is not admissible under article 3726a because it does not contain statements relating to the "family history, genealogy, marital status, or heirship of a decedent . . . ." Nevertheless it is admissible under the terms of article 3731a. It was made by an officer of this state and is relevant in that the court found that Mary had ¼ undivided interest in the property. The county court would necessarily have jurisdiction to determine the extent of the property held by the child, Mary.

Appellants' exhibit # 11 is an order of the probate court of Harris County, Texas. In this order the court found that Claude N. Paulus was the natural father of Mary Josephine Paulus.

The probate court further found that Mary owned a ¼ undivided interest in certain lands. The order did not define the origin of her title. It is apparent that the land is that which was devised under the will of Annie. The court's finding that Claude was the natural father of Mary is certainly admissible under article 3726a. This statement clearly reflects an aspect of the family history of Annie C. Paulus, deceased, and is some evidence that Claude was the father of Mary.

About the finding that Mary owned an undivided interest in certain real estate, such finding is admissible because it is evidence of the court's finding that Mary was a taker under the will of Annie. Because that evidence is relevant, this part of the probate court's order is admissible under article 3731a. Appellants' fifth point is overruled in regard to their exhibits numbered 5, 6, 7, 9, 10, 12 and 14. This point is sustained regarding exhibits numbered 8 and 11.

By their sixth point of error, appellants argue that Mary qualifies under Annie's will as a matter of law. This contention is in error. Even if we assume that appellants have established a valid marriage between Claude and Lilla as a matter of law, there still remains a fact issue regarding the identity of Mary's father. Lilla testified (on a bill of exceptions) that Claude was not the father of Mary. This testimony was improperly excluded because it was admissible on the issue of Mary's qualification under the will. Davis v. Davis, supra. Appellants' sixth point is overruled.

For the reason stated in our discussion of appellants' sixth point, their seventh point is overruled.

Appellants' eighth point of error asserts that the trial court erred in failing to hold, as a matter of law, that Mary Paulus Wood was entitled to ⁵⁄₈₄ interest in the estate of Annie C. Paulus, deceased. This contention is based upon the failure of some of the beneficiaries to answer appellants' request for admission of facts and genuineness of documents under Texas Rules of Civil Procedure, 169. Because those parties failed to answer the requests, the trial court granted appellants' motion to deem those requests admitted. Therefore, the appellants argue, the deemed admissions entitle Mary to the interest in the estate of Annie to which the defaulting parties would succeed if Mary should be shown to be unqualified as a devisee under the will in question.

Because we are reversing this case and remanding it for trial for the reasons set out in our discussion of appellants' first, second, third and fifth points, we deem it unnecessary to resolve appellants' eighth (the last) point.

The judgment of the trial court is reversed and the cause is remanded for trial.

NYE, Chief Justice (concurring).

I agree that this case should be reversed and remanded for trial because there was

some evidence [1] that Mary Josephine was a lawfully begotten child of the testatrix's son, Claude N. Paulus. Such evidence required the trial court to submit the disputed fact issues to the jury.

I disagree with the majority opinion in two (2) major areas. First, because the marriage license was improperly admitted into evidence and second the interpretation that the majority gives to the testatrix's will.

It is fundamental that the primary concern of the courts in will construction is the determination of the testator's (testatrix's) intent and the effectuation of that intent as far as is legally possible. Philleo v. Holliday, 24 Tex. 38 (Tex.Sup.1859); Sellers v. Powers, 426 S.W.2d 533 (Tex.Sup.1968). To this end, resort may be made to the provisions of the will as a whole and the surrounding circumstances, rather than a particular word or isolated provision, if the intention is not clearly expressed. Haile v. Holtzclaw, 414 S.W.2d 916 (Tex.Sup.1967).

The primary question before the Court is what meaning should be given to the word "begotten" in the will of Annie C. Paulus. In order to give effect to her testamentary intent, it is our duty to attempt to determine such intent by the particular language used as nearly as possible. The majority would construe the word "begotten" to mean "born". This would place a strange and improper interpretation on the testatrix's will. This interpretation would make one ask two questions: What is meant by lawfully born children? and second, Did the mother (testatrix) want to give her estate to any child; regardless of whether it was her son's child or not, so long as it was "born in lawful wedlock"?

In order to properly determine the testatrix's intent the particular paragraph in question can be broken down into two clauses: a granting clause and a subsequent clause—divided they read as follows:

## GRANTING CLAUSE

"I give to Henry S. Paulus one-fourth (¼) of my estate to be held in trust by him for any *lawfully begotten children of my son*, Claude N. Paulus, *born after my death*,

## SUBSEQUENT CLAUSE

But in case he should die without leaving any living children begotten in lawful wedlock *after my death*, then in that event . . . ."—etc.

Construction of a will must be based on the language of the instrument. Where its language is free from doubt, a will is construed according to its legal import. But if the terms of the instrument create an ambiguity, the will is to be construed in the most reasonable manner possible. 61 Tex.Jur.2d Wills § 151 (1964). Each provision in a will must be interpreted as meaning something, and where possible, each provision will be harmonized with all other provisions. Stephens v. Dennis, 72 S.W.2d 630 (Tex.Civ. App.—Eastland 1934, writ ref'd). The words in each paragraph of a will should be given such force and effect so as to harmonize with the whole instrument, thereby permitting all its parts to stand together.

The appellants would have us construe the term "begotten" so that such word would be synonymous with "born". The appellees on the other hand contend that the term "begotten" when considering the testatrix's intent could only mean "conceived".

First, we look to the ordinary meaning of the word begotten. Almost all of the dic-

---

1. A certified copy of a joint affidavit of Henry S. Paulus and J. F. Bozka which was recorded in the office of the county clerk in the county where the suit was pending and the land was located setting out the heirship of the decedent and the marriage between Claude and Lilla on November 10, 1946.

tionary definitions of begotten construe the word to mean conceive. In Webster's Seventh New Collegiate Dictionary, the term begotten is defined as: 1) to procreate as to father; sire; 2) cause. In Black's Law Dictionary (4th Ed. 1968), begotten is defined as " 'to be begotten' means the same as 'begotten', embracing all those whom the parent shall have begotten during his life, quos pro creaverit." There is no mention of the word born. However, when the word born is defined, its meaning is: 1) brought into existence by or as by birth; 2) having from birth specified qualities; or being in specified circumstances from birth. Webster's Seventh New Collegiate Dictionary. In Black's Law Dictionary, the word "born" is described thus: "if an infant is born dead or at such an early stage of pregnancy as to be unable to live, it is to be considered as never born". In each instance the word "born" does not refer to the word begotten thereby leaving us with the inescapable conclusion that born and begotten are not synonymous. They do in fact have different meanings. The testatrix knew of both words and used both words in the same sentence. Had she intended "born" to mean "begotten", undoubtedly she would have used such word. Again, why would the testatrix say lawfully "born" child of my son? The words "child of my son" nearly tells it all. Lawfully born has no particular meaning, but lawfully conceived does. It is the duty of this Court then to determine the intention of the testatrix, as far as possible from the particular language used.

To be born in lawful wedlock is not important under this will. Annie C. Paulus wanted a direct lineal descendant of Claude Paulus to take the ¼th share of her estate. If you use the word "born" in the place of "begotten" in the subsequent part of the subject paragraph, a legally conceived child of Claude could be born after the testatrix's death and not born in lawful wedlock, i. e. (if Claude's purported marriage had been terminated by death or divorce). This could deprive Claude's legally conceived (begotten) child the right to take under the will. Where as here, there has been an absolute grant ("for any lawfully begotten children of my son") such estate, absolutely given, should not be reduced by a subsequent provision of the will, in absence of a clear intent of the testatrix. If we followed the majority's construction of the will, this is what would happen. Nor would the subsequent clause as interpreted by the majority manifest the testatrix's intent to give her estate to the "children of my son" when the clause as interpreted could permit a child to take her estate that was not the son's child so long as he was married at the time the child was born.

The testatrix used born and begotten in her will, to-wit: ". . . For any lawfully *begotten* children of my son Claude N. Paulus, *born* after my death. . . .". By using the two different words, it is clear that the testatrix used begotten in the sense of "conception" and the word "born" in the sense of an actual birth. Otherwise she would have used born in both instances.

There appears to be an additional sound reason for the two different terms being used in the will. The testatrix devised other interest in her estate to her other children. She did not require that her children's children be conceived in lawful wedlock nor were they required to be born after her death as she required of her son, Claude. The evidence showed, however, that Claude Paulus, her youngest son, was a special case and was treated as such in the will. The evidence shows that Claude was a gambler and was in trouble many times. He had forged his mother's name to many checks. Henry Paulus testified he had to go to Houston 75 to 100 times to help Claude out. You could reason then, that Annie Paulus was motivated to set out specific conditions that only those children of Claude that were both lawfully begotten

and born after her death would take under the will.

To recapitulate, the particular provision of the will provides without dispute that one-fourth of the estate was to be held in trust by Henry Paulus with the income to go to Claude. Those amounts held in trust were for the benefit of "any lawfully begotten children of my son Claude N. Paulus". Said lawfully begotten children of Claude had to be born after the testatrix's death. Thus, the testatrix set up two requirements for the children of Claude to take, to-wit: 1) only those children born after her death; and 2) only those children that were lawfully begotten children.

It is undisputed that "lawfully" means legitimate. The term "begotten" means to procreate as the father; sire; or cause. There appear to be numerous other instances in which the word begotten is construed to mean conceive or sire.[2] For instance in the Bible in the first chapter of Matthew, the term "begot" is extensively used in the context of meaning conceived or sired. Begotten is a biblical word and is used many times in the Bible to mean conceived or sired. The testatrix's intent inescapably was, that any lawfully sired, procreated or caused children conceived during the lawful marriage of her son Claude, born after her death should take, such constituting the granting clause of this paragraph of the will.

The second part of the particular provision of the will in question reads: "but in case he should die without leaving any living children begotten in lawful wedlock after my death" is inconsistent with the granting clause in that it would seem to require that the child be conceived after her death. To be consistent with the granting clause, that phrase should include the word "BORN" prior to the words "after my death" the same as it is used in the grant-ing clause of the will. Said clause then would read: "but in case he should die without leaving any living children begotten in lawful wedlock (BORN) after my death then in that event," etc. This would make both provisions of the will consistent throughout. It is a well recognized rule in will construction cases that words, or clauses or sentences, or even whole paragraphs, may be transposed, supplied or rejected in arriving at the real intention of the testator. Mercantile National Bank at Dallas v. National Cancer Research Foundation, 488 S.W.2d 605 (Tex.Civ.App.—Dallas 1972, writ ref'd n. r. e.); McClure v. Bailey, 209 S.W.2d 671, 675 (Tex.Civ.App.—Waco 1948, writ ref'd n. r. e.); Jackson v. Evans, 305 S.W.2d 236, 240 (Tex.Civ.App.—Fort Worth 1957, writ ref'd n. r. e.). Thus, in order to arrive at the real intention of the testatrix, in order to give the words "born" and "begotten" their proper and usual meaning, in order to make both the granting and subsequent phrases of the will consistent throughout, and in order to not arrive at a strained construction of the testatrix's will, the word "born" should be supplied. The testatrix's intent follows: that only children of her son conceived in lawful wedlock and only children of her son born after her death would take under the will.

Included in the record is a purported marriage certificate stating that Claude and Lilla were married November 10, 1946. However, there is a serious question as to its admissibility. Appellant introduced the document under the authority of article 3731a § 4.

The question before us is whether the appellants in offering the documents evidencing a marriage between Claude and Lilla Paulus properly complied with the statutory method of authentication of foreign official documents under article 3731a,

---

**2.** Dorland's Medical Dictionary (21st ed. 1948); Funk & Wagnalls Desk Standard Dictionary (1928); Webster's Third International Dictionary (1968); Webster's Seventh New Collegiate Dictionary (1961).

Tex.Rev.Civ.Stat.Ann. Article 3731a reads in pertinent part as follows:

"Federal, Out of State, and Foreign Records

"Sec. 2. Any written instrument which is permitted or required by law to be made, filed, kept or recorded (including but not limited to certificate, written statement, contract, deed, conveyance, lease, concession, covenant, grant, record, return, report or recorded event) by an officer or clerk of the United States or of another state or nation or of any governmental subdivision of any of the foregoing, or by his deputy or employee; or by any Notary Public of a foreign country in a protocol or similar book in the performance of the functions of his office, shall, so far as relevant, be admitted in the courts of this State as evidence of the matter stated therein, subject to the provisions in Section 3. . . .

"Notice to Adverse Party

"Sec. 3. Such writing shall be admissible only if the party offering it has delivered a copy thereof, or so much of it as may relate to the controversy, to the adverse party a reasonable time before trial, unless in the opinion of the trial court the adverse party has not been unfairly surprised by the failure to deliver such copy.

"Authentication of Copy

"Sec. 4. Such writings may be evidenced by an official publication thereof or by a copy *attested by the officer having the legal custody of the record,* or *by his deputy.* Except in the case of a copy of an official writing from a public office of this State or a subdivision thereof, the attestation shall be accompanied with a certificate that the *attesting officer has the legal custody of such writing.* If the office in which the record is kept is within the United States or within a territory

or insular possession subject to the dominion of the United States, the certificate may be made by a *judge of a court of record of the district or political subdivision in which the record is kept,* authenticated by the seal of his office. *If the office in which the record is kept is in a foreign state or country, the certificate may be made by a secretary of embassy or legation, consul general, consul, vice consul, or consular agent or by any officer in the foreign service of the United States, or by any officer of a United States military government, stationed in the foreign state or country in which the record is kept,* and authenticated by the seal of his office. . . ." (Emphasis supplied.)

The above quoted sections of Article 3731a § 4 requires in each instance that the copy of the document is to be attested to by the officer having the legal custody of the record. The first instance requires that a copy be attested by *the officer having the legal custody of the record.* In the second instance, except in the case of a copy of an official writing from a public office of this State or a subdivision thereof, the attestation is to be accompanied with a certificate *that the attesting officer has the legal custody of such writing.* The third instance, in which the office in which the record is kept is in the United States or within a territory or consular possession subject to the dominion of the United States, the certificate may be made by a judge of a court of record of the district or political subdivision *in which* the record is kept, authenticated by the seal of his office. Here again, the requirement is that the certification is to be made by a particular named person, *where such record is kept.* (Emphasis supplied.)

The fourth instance concerns an instrument that is kept in a foreign country. In this case, the certificate may be made by a secretary of embassy or legation, consul general, vice counsul, or consular agent or by any officer in foreign service of the

United States, or by any officer of a United States Military government, *stationed in the foreign state or country in which the record is kept.* This last part of the sentence "stationed in the foreign state or country in which the record is kept" modifies or attaches to all those officials named therein. This construction would be consistent with the other provisions in Section 4 requiring that the certification be made by a particular named person who is stationed *where the record is kept.* (Emphasis supplied.)

Also by the terms secretary of embassy or legation, consul general, vice consul, or consular agent or by any officer in the foreign service of the United States, the legislature intended to name a person which would be a United States citizen stationed in that foreign country or State. The instrument would have more credence, in my opinion, if its certification came from the named officials if they were United States citizens stationed in the foreign country where the record was kept. This is consistent with the Texas cases. In State v. Balli, 173 S:W.2d 522 (Tex.Civ.App.—San Antonio 1943, aff'd 144 Tex. 195, 190 S.W.2d 71, 328 U.S. 852, 66 S.Ct. 1341, 1363, 90 L.Ed. 1624), the appellees undertook to establish the validity of the alleged grant from the State of Tamaulipas by introducing four purported copies of the expedient. The original expedient was properly archived at Matamoros. The court in admitting the copies stated:

". . . Both are photostatic copies of the protocol, certified to as correct by El Presidente Municipal (Mayor) of the City of Matamoros and attested by the secretary. Both copies also bear the *certificate of the Consul of the United States of America at Matamoros, Mexico,* to the effect that the signatures of the Mayor and Secretary are genuine and that such persons are in truth the Mayor and Secretary of the Municipality of Matamoros to whose official acts faith and credit are due. The *Consul* further certified that

the copies had 'been issued by the lawful custodian of the original document extant in the archives of the Municipality of Matamoros for the years 1827–1830'." (Emphasis added).

Again, in Williams v. Conger, 49 Tex. 582 (Tex.Sup.1878, 125 U.S. 397, 8 S.Ct. 933, 31 L.Ed. 778), the United States Supreme Court in admitting certain instruments, held said copy of a deed taken from the public archives of Mexico, with the certificate of the proper custodian to the effect that it is a true copy, to be delivered to the United States Consul, by virtue of a judicial mandate, and the authority of the custodian being authenticated by the certificates of three other officers of the foreign government, and the *proper United States officers in Mexico,* together with the testimony of the custodian and others to the same effect, was sufficient authentication and thus properly admitted into evidence.

In both of the above cases, a United States official located in Mexico, where the record was kept, certified them. I have been unable to find a single case which required less. I believe Article 3731a adopted this requirement that a U. S. official in the foreign country must certify the record. A Mexican citizen with the title of Consul located in the United States (Houston, Texas) attempting to certify records which were not kept in Houston, but were kept in Atizapan, Mexico, could not satisfy the requirements of Article 3731a § 4. The Mexican Consul was not located where the writing was kept and was not a U. S. citizen. If you followed the reasoning of the majority, then any consul of any country residing in any country other than where the records are kept could make such certification. This is not what the statute says nor how the courts of Texas have approved such certification in the past. The marriage certificate not being properly certified should not have been introduced into evidence.

The appellants contend that Claude and Lilla had a valid common law marriage. The evidence shows that Lilla met Claude for the first time in 1947. She testified that she was pregnant at the time she met Claude. She stated that Claude was not the father of Mary Josephine. Such testimony was admissible. See Davis v. Davis, 521 S.W.2d 603 (Tex.1975). It was against her interest to so testify. As such, it is considered cogent and binding upon her. Mary Josephine was born September 12, 1947. Dr. Harvey Renger, M. D., testified that assuming a normal period of gestation and delivery, a child born on this date was conceived in the month of December, 1946, around the 15th or 17th day of that month. Since Mary Josephine could not have been "begotten in lawful wedlock" (if the jury believed this testimony), this would of itself preclude appellant from taking under the will.

There was compelling evidence discounting any legal marriage. The record reflects that Claude and Lilla went to Mexico City in 1948. This was Lilla's first trip to Mexico. The purpose of said trip, according to Lilla, was to obtain and backdate a marriage license, showing that she and Claude were married in November 1946. This latter evidence was admitted without objection. The year 1948 was corroborated by Gillermo Garcia, a disinterested witness. He testified among other things that he was in the tourist guide business when he first met Claude and Lilla in Mexico which was in 1948. He testified to putting Claude and Lilla in contact with a lawyer and taking all of the parties with him to Atizapan de Zaragoza where the documents were issued in connection with the alleged marriage. Lilla testified that she saw Claude put $500 in an envelope and give the same envelope to Garcia. According to the testimony of Gillermo Garcia, his job for Claude was to arrange a marriage for Claude and Lilla. He testified that he was personally present at the purported marriage ceremony. Lilla testified that her parents kept Mary Josephine while she and Claude went to Mexico. It is clear from such undisputed evidence that Claude and Lilla were not married in December 1946 when the child was conceived. Lilla testified that the date on the marriage certificate was November 10, 1946, which was on a Sunday. Gillermo Garcia, the disinterested witness testified that all official government offices in the Republic of Mexico and at Atizapan de Zaragoza which could have performed this transaction were closed on Sundays.

It thus appears that the appellant Mary Josephine Wood may have difficulty in proving up a valid ceremonial marriage. If the jury chose to believe that Mary Josephine's mother was pregnant at the time she first met Claude and that Claude Paulus was not in fact the father of Mary Josephine, then I do not believe that she should take under the will of Annie Paulus. The majority would rely upon a legal common law marriage and the interpretation that so long as Mary Josephine was born during a lawful marriage (common law), she could take even if she was not in fact the child of Claude Paulus. This was not the testatrix's intent!

Except for the introduction without objection of the affidavit of heirship (see footnote 1) which was some evidence of a valid marriage prior to the time Mary Josephine was conceived, I would affirm the judgment of the trial court.