Nancy Kway DAVIS et al., Petitioners,

v.

Mary Nell DAVIS et al., Respondents.

No. B–4652.

Supreme Court of Texas.

April 9, 1975.

Rehearing Denied May 7, 1975.

R. E. McDaniel, Winnie, for petitioners.

J. C. Zbranek and C. T. Hight, Liberty, Neal J. Iverson, Dayton, for respondents.

REAVLEY, Justice.

Charles Davis was killed by shipwreck in the Sea of Java on December 24, 1970, at the age of 36 years. The Probate Court of Chambers County, where the administration of his estate is pending, is in possession of the small amount of his personal property, together with wages due from his employer, Reading & Bates Offshore Drilling Company, and the proceeds of a group accidental death insurance policy which was purchased by that employer and issued a few days prior to the death of Charles. The insurer has paid $51,031.38 into the registry of the Chambers County Court. This litigation will determine the heirship of Charles Davis and the manner of division of this property.

Charles married Mary Nell in Liberty County in 1966, and in 1967 he departed for Australia without her on an assignment with Reading & Bates. After a year or so in Australia he was in Iran briefly, and then in August of 1968 he was assigned to Singapore. On October 2, 1968, a Buddhist wedding ceremony was performed to unite Charles and Nancy, and they lived together as man and wife in Singapore

from that time until his death. Approximately one month after his death, both Mary Nell and Nancy gave birth to daughters.

▮ This controversy ensues over the status and rights of Mary Nell and Nancy, and of the daughter of each. The County Probate Court held that Nancy was the lawful widow of Charles and that both of these daughters were entitled to inherit as children of Charles. The District Court, after an appeal and de novo trial without a jury, decided that Mary Nell was the widow, that Nancy was the putative wife, but that the daughter born to Mary Nell after the death of Charles was not his child and was not entitled to inherit any portion of his estate. The Court of Civil Appeals agreed that Mary Nell was the lawful widow and that her daughter was not the child of Charles, but it held that Nancy was not the putative wife at the time of the death of Charles. 507 S.W.2d 841. The only difference between the District Court and the Court of Civil Appeals in the division of the property was in the allotment to Nancy. What did not go to Nancy, under either judgment, went one-half to Mary Nell and the remaining one-half in equal parts to the children of Charles. The District Court awarded Nancy one-half of the wages due and the insurance proceeds; the Court of Civil Appeals judgment gave her nothing. Both Courts ruled that Mary Nell's daughter was not the child of Charles, and both ruled that Nancy's daughter inherited as a child of Charles. Even though the Court of Civil Appeals held that Nancy's putative status was terminated prior to the death of Charles, that holding would not prevent the daughter from being a legitimate child of their marriage. V.A.T.S. Probate Code, § 42.

Nancy is here contending that she is the lawful widow or, at least, that she was the putative wife. Mary Nell's daughter contends that she is the legitimate child of Charles.

▮ We hold, first, that Nancy was not the lawful widow of Charles. While it is initially presumed that Charles and Mary Nell were divorced prior to the wedding ceremony between Charles and Nancy (Texas Employers' Insurance Ass'n v. Elder, 155 Tex. 27, 282 S.W.2d 371, 1955; Vernon's Tex.Family Code Ann. § 2.01, 1973), the evidence presented by Mary Nell was legally adequate to rebut that presumption. It is shown that the records in Chambers and Liberty Counties reflect no divorce between them, that the records of the State of Queensland, Australia, show no divorce during the period from September 1, 1967 to December 31, 1970, and that the records in Singapore show no divorce between them during that same period. It is not necessary in order to rebut the presumption that Mary Nell prove the nonexistence of divorce in every jurisdiction where proceedings could have been possible; it is only necessary to rule out those proceedings where Charles might reasonably have been expected to have pursued them. Caruso v. Lucius, 448 S.W.2d 711 (Tex.Civ.App.1969, writ ref'd n. r. e.). The trial court was entitled to find that there had been no divorce between Charles and Mary Nell and that Mary Nell was therefore his lawful widow.

▮ We next hold that Nancy was the putative wife of Charles. A written contract of marriage (the Chinese document and the English translation), signed by Charles and Nancy, together with her father and another witness, certifying the marriage as being solemnized on October 2, 1968, was placed in evidence. Nancy and two other witnesses testified to the full formality of the ceremony, which was held in the home of her parents with all of her family participating and with twenty persons in attendance. For more than two years thereafter, and until the date of his death, Charles and Nancy lived together as man and wife. Nancy testified that Charles told her of his previous marriage but also assured her that he was divorced

and free to marry her. The evidence clearly warrants the finding that Nancy entered this relationship in good faith. The attorney for Mary Nell, however, having proved that official Singapore records show no registration of this marriage prior to the death of Charles, contends that the marriage was entirely void and of no legal effect under Singapore law. He placed in evidence photographic copies of a portion of the pages of what appears to be an official publication of the law of the Republic of Singapore. There was no pleading as to the law of Singapore, nor do these pages establish the total effect of that law as it pertains to Nancy and Charles. Even if there had been an adequate pleading and if we assume that these copies faithfully reflect some of the pages of an official publication, on this record the Texas courts cannot determine that the total law of Singapore would brand the relationship of Nancy and Charles as meretricious. See generally: Thomas, Proof of Foreign Law in Texas, 25 Sw.L.J. 554 (1971).

■ The Court of Civil Appeals has held that even though Nancy may have become the putative wife of Charles at the outset and continued in that relationship for two years thereafter, at a time prior to his death she was put on notice that he was not divorced from Mary Nell—whereupon her putative standing terminated. The evidence on this point turns on the following testimony by Nancy:

Q: Now, during—well—subsequent to April 2, 1968 and before December 23, 1970, you learned, did you not, that Mary Nell Davis was trying to get a divorce from Charles Davis?

A: I didn't learn nothing of that.

Q: Well, you remember you [sic] asking that question on your deposition?

A: You asking me whether I received —

Q: No ma'am, I didn't ask you if you received it. I asked you if you

learned that Mary Nell Davis was trying to get a divorce from Charles?

A: I learned it.

Q: Yes.

A: I know it.

The interrogation on the occasion of Nancy's deposition, which was introduced at the trial by the lawyer for Nancy to show a waiver of the dead man's statute, does not throw much light on this matter except for her statements that she knew that Charles was asked to sign a paper which came in the mail at a time when she was pregnant with the child born after the death of Charles. This testimony does not establish conclusively her lack of good faith. In the first place, it is not clear when Nancy understood that Mary Nell was "trying to get a divorce." She appreciated the facts as of the time of the trial, but it is not clear that she did so prior to the death of Charles. And even if she knew that these were divorce papers, it does not necessarily follow that Nancy had any reason to believe that Charles had been dishonest with her and had not obtained a prior divorce from Mary Nell. Before we charge Nancy with bad faith or impose upon her a duty to investigate matters, we must take into account that she was in Singapore and not in Texas, that she knew nothing of Texas law, and that she was a 20 year old Chinese woman who had always lived in Singapore and was then expecting a child by a husband who had given her no reason to believe that he had another wife. The trial court was entitled to find in her favor; we hold that the record does not conclusively establish her lack of good faith.

■ As a putative wife Nancy is entitled to the same right in the property acquired during her marital relationship with Charles as if she were a lawful wife. Lee v. Lee, 112 Tex. 392, 247 S.W. 828 (1923); Speer's Marital Rights in Texas § 56 (4th ed. 1961). In her case it will be half of

the wages owed by the employer at the date of his death as well as half of the proceeds from the insurance policy which was furnished by the employer as an incident of the employment.

■ This brings us to the question of the legitimacy of Mary Nell's daughter who was born a month after the death of Charles. We agree with the Court of Civil Appeals that impossibility of access between Charles and Mary Nell, during the time when this child might have been conceived, has not been proved unless we consider the testimony to that effect by Mary Nell herself. Whether her testimony may be considered depends on whether we apply the Rule of Lord Mansfield, so-called because it was Lord Mansfield in Goodright v. Moss, 98 Eng.Rep. 1257 who said in 1777 that husband and wife "shall not be permitted to say after marriage that they had no connection and therefore that the offspring is spurious." This rule has been applied to exclude testimony to facts that would bastardize one's own child as of the time of birth. Esparza v. Esparza, 382 S. W.2d 162 (Tex.Civ.App.1964, no writ). It has even been used to exclude testimony on the ground that the effect would not be in accord with the innocence of married persons. Burtis v. Weiser, 195 S.W.2d 841 (Tex.Civ.App.1946, writ ref'd); *Contra,* Gravley v. Gravley, 353 S.W.2d 333 (Tex. Civ.App.1962, writ dism'd).

Until the Court of Civil Appeals opinion in the present case, Texas courts have accepted Lord Mansfield's Rule as the law of this state. Adams v. Adams, 456 S.W.2d 222 (Tex.Civ.App.1970, no writ); Barnett v. Barnett, 451 S.W.2d 939 (Tex.Civ.App. 1970, writ dism'd); Longoria v. Longoria, 324 S.W.2d 244 (Tex.Civ.App.1959), writ dism'd per curiam, 160 Tex. 134, 327 S.W. 2d 453 (1959); Carnes v. Kay, 210 S.W.2d 882 (Tex.Civ.App.1948, no writ); Gonzalez v. Gonzalez, 177 S.W.2d 328 (Tex.Civ. App.1943, no writ); Moore v. Moore, 299 S.W. 653 (Tex.Civ.App.1927, no writ);

Pinkard v. Pinkard, 252 S.W. 265 (Tex. Civ.App.1923, no writ). All the while there has been widespread denunciation of the Rule. Wigmore on Evidence § 2063 (2nd ed. 1923); 1 McCormick & Ray, Texas Law of Evidence § 90 (2nd ed. 1956); Note, 6 Tex.Tech.L.Rev. 231 (1974).

■ Rules that exclude evidence bearing directly on the truth to be determined ought not to survive without very good cause. The testimony of a spouse on the matter of non-access by the other spouse is, subject to the usual tests of credibility, clearly the best evidence of that fact. The present case is one where all of the testimony establishes beyond any reasonable doubt that Mary Nell's daughter is not the child of Charles. Then why should the courts refuse to accept the truth? And is there not a valid objection to allowing the child of another father to inherit part of this estate? Some courts have said that the Rule is required for the protection of the child. This may or may not be its consequence. It may be harmful to the interest of the child. E. g., Esparza v. Esparza, 382 S.W.2d 162 (Tex.Civ.App. 1964, no writ); U.S.F. & G. Co. v. Henderson, 53 S.W.2d 811 (Tex.Civ.App.1932, no writ).

The contention is made that this is a rule which cannot be changed by judicial decision, because it was adopted in 1840 by statute as part of the common law. Art. 1, Vernon's Ann.Civ.St. This argument is often made and sometimes accepted (e. g., Gonzalez v. Gonzalez, 177 S.W.2d 328, Tex.Civ.App.1943, no writ), but it misunderstands what the common law was and is. The common law of England was conformable to "the law of Nature, the law of God, to common sense, to legal reason, justice, and humanity." Broom, Commentaries on the Common Law, p. 21, (4th ed. 1869). Calvin's Case, 7 Co. 1a, 77, Eng.Rept. 377, 391 et seq. (K.B.1608); Forbes v. Cochrane, 107 Eng.Rep. 450, 455, 458 et seq. (K.B. 1824). Lord Mansfield proclaimed the basis

of this very rule to be "decency, morality and policy." The system and tradition that we call the "common law" is not a body of law which evolved within historic England or a bygone age to stand immutable ever afterward. It is the guide and governance of this Court today—in the absence of a mandate of the Constitution or statute. Learned Hand said that our common law is "a combination of custom and its successive adaptations. The judges receive it and profess to treat it as authoritative, while they gently mould it the better to fit changed ideas." THE SPIRIT OF LIBERTY p. 52 (1952). "This flexibility and capacity for growth and adaptation is the peculiar boast and excellence of the common law." Hurtado v. California, 110 U. S. 516, 530, 4 S.Ct. 111, 118, 28 L.Ed. 232 (1884). "[A]s life is always in flux, so the common law, which is merely life's explanation as the lawyer and the judge, law's spokemen, are always making it, must also be." Hutcheson, The Common Law of the Constitution, 15 Tex.L.Rev. 317, 319 (1937).

This Court has not regarded the legislative adoption of the common law as installing all of the prior rules of English courts with statutory authority. It held that we would look to the declaration of the courts of the several states to determine the body of common law in 1840, and that this should be effectuated only so far as not inconsistent with the conditions and circumstances of the people of this state. Grigsby v. Reib, 105 Tex. 597, 153 S.W. 1124 (1913); Diversion Lake Club v. Heath, 126 Tex. 129, 86 S.W.2d 441 (1935). This Court has often rejected earlier rules of common law, including those in force in 1840. E. g., Roberts v. Short, 1 Tex. 373 (1846); Mud Creek Irr., Agr. & Mfg. Co. v. Vivian, 74 Tex. 170, 11 S.W. 1078

(1889); Dickson v. Strickland, 114 Tex. 176, 265 S.W. 1012 (1924); Billings v. Atkinson, 489 S.W.2d 858 (Tex.1973).

 It does not follow that this Court, or any court, is entitled to apply or not apply the rules of law according to preference in the individual case. Those who depend upon the law require continuity and predictability. If the administration of justice is to be effective in the trial courts, the rules must not be constantly shuffled. The appellate court must always start with the rule of precedent and either apply it faithfully or modify the rule if it is not consistent with the prevailing customs and precepts of the legal profession and of the community, giving particular attention to that portion of the community most concerned and affected by the rule.

 If Lord Mansfield's Rule were one that had been counted upon in the planning of property rights, it should be left to the Legislature to change. That is no obstacle in this case. The Rule has never prevented proof of non-access of spouses for a determination of illegitimacy of a child born or conceived during wedlock. The exclusion has only applied to testimony by the spouses themselves. Proof of illegitimacy has been made more difficult, but there is no rule of law that prevents the fact from being shown if other evidence is available. Regarding blindfolds on triers of fact with disfavor, and finding no justification for perpetuating this decree by Lord Mansfield, we hold that testimony of non-access between man and woman is admissible from any witness knowledgeable of the fact.

The judgment of the Court of Civil Appeals is reversed; the judgment of the District Court is affirmed.