[No. 18124–0–II.   Division Two.   May 3, 1996.]

BONNIE SEIZER, *as Guardian, Appellant,* v. DON SESSIONS, *as Personal Representative,* ET AL., *Respondents.*

88

*Gideon D. Caron* and *Morse & Bratt*, for appellant.

*R. Daniel Lindahl, Gregory E. Price*, and *Bullivant, Houser, Bailey, Pendergrass & Hoffman*, for respondents.

WIGGINS, J.* — Rosalie Sessions, first wife of the late Elmer Sessions, and Barbara Sessions, Elmer's third wife, each claims a portion of lottery proceeds won by Elmer before his death. Elmer abandoned Rosalie in Texas almost 40 years ago and later married Barbara while living in Washington. Rosalie claims that Elmer never divorced her. Ownership of the lottery proceeds depends on the choice of law. Under Texas law, Rosalie might be entitled to one–quarter of the proceeds if she can prove that Elmer never divorced her. Under Washington law, Barbara might be entitled to the entire proceeds if Barbara can prove that Rosalie's marriage with Elmer was defunct. We hold that Texas has the most significant relationship to the distribution of the marital assets and we reverse and remand for application of Texas law.

## FACTS

Elmer and Rosalie Sessions married on November 21, 1941, in Houston, Texas. Their daughter Bonnie, now Bonnie Seizer (Seizer), was born in 1942. Rosalie and Elmer lived in Houston until approximately 1948. From 1949 until 1954 the family traveled throughout the country, living in eight cities during those 5 years. Elmer's work in the oil business required frequent moves.

In 1954, while living in New York State, Rosalie Sessions was hospitalized for the treatment of mental illness.[1] After the hospital released Rosalie, Elmer moved the family back to Houston. Rosalie became ill again during the drive back. In Houston, Elmer left Rosalie and Seizer living with Rosalie's parents. Elmer then returned to New York to work. While in New York, he corresponded with the family. In late 1954 or early 1955, Elmer visited the

---

*Judge Charles K. Wiggins was a member of the Court of Appeals, Division Two, at the time oral argument was heard on this matter. He is now serving as a judge pro tempore of the court pursuant to CAR 21(c).

[1]Because Rosalie is legally incapacitated, she was not deposed in preparation for the summary judgment motion. Bonnie Seizer's deposition is the primary source of information about Rosalie's marriage.

12–year–old Seizer and her grandparents for a few days. Rosalie was in a mental hospital at the time. Then Elmer "just announced he was leaving." No one knew where he was going. During 1956 and 1957 Elmer contacted the family infrequently as he moved around the country.

After 1957, neither Rosalie nor Seizer talked with Elmer, and Elmer did not provide any financial assistance to his family. Seizer said that she and her grandparents believed Elmer had started a new life and would not be returning. Seizer attempted unsuccessfully on a couple of occasions to contact her father. Seizer was unaware if Rosalie had considered filing for divorce or separation.

Seizer believes, but does not know for sure, that her mother did not contact or communicate with Elmer after 1957. According to Seizer, Rosalie has been "out of touch with reality" since 1954. She and Rosalie did not discuss Elmer because "[i]t was a sensitive area with [Rosalie] . . . she was ill." Since 1954, Rosalie's parents and daughter have handled her financial matters.

While separated from Rosalie, Elmer married Mary Anastos in July 1955; Elmer and Mary divorced in 1982. In 1984, Elmer and Barbara Sessions married. Barbara was unaware of his pre–existing marriage to Rosalie. The couple lived in Washington during their marriage.

In September 1989, Elmer and Barbara visited Tucson, Arizona, on an extended business trip. On September 27, 1989, either Barbara or Elmer purchased a ticket in the Arizona State lottery and won $2,576,908.30, with a net annual payment to Elmer of $97,922.53 for 20 years. The beneficiary of the annuity is Barbara M. Sessions.

Elmer died on August 19, 1991. Don Sessions (Sessions) is the personal representative of the estate of Elmer Sessions. In 1992, Seizer, as Rosalie's guardian, filed this action seeking Rosalie's community property interest in the Arizona lottery proceeds. Seizer sought a partial summary judgment that the law of Texas applied. Barbara Sessions

moved for summary judgment dismissing the case.[2] On March 18, 1994, the trial court granted summary judgment in favor of Barbara, holding that as a matter of Washington law, the marriage was defunct and that RCW 26.16.140 precluded recovery. Seizer appeals.

## Disputed Facts

The parties dispute who purchased the winning ticket, Elmer or Barbara.

The lottery ticket is treated as bearer paper, similar to cash. Whoever signs the ticket is entitled to payment. Elmer completed and signed the winner claim form for the lottery ticket. Elmer also signed an "Annuity Information" sheet identifying Elmer as the lottery annuity recipient and Barbara M. Sessions as the beneficiary.

In her affidavit, Barbara claims she purchased with her own money the winning lottery ticket at a Circle K store. She spent September 27 with her friend, Rosetta Low. Low claims she witnessed Barbara purchase lottery tickets between 5 p.m. and 5:30 p.m. at the Miracle Mile Drive Circle K. But a lottery official stated that the lottery ticket was purchased at approximately 3:02 p.m. on the day of the drawing.

We review the summary judgment order de novo, performing the same inquiry as the trial court.[3] We affirm a summary judgment if the parties have failed to present to the trial court evidence of a genuine issue of material fact and, further, if the moving party is entitled to judgment as a matter of law.[4] We view the facts in a light most favorable to the nonmoving party.[5] All reasonable

---

[2]Sessions also argued that the doctrine of laches precluded recovery but does not argue this theory on appeal.

[3]*Syrovy v. Alpine Resources, Inc.*, 122 Wn.2d 544, 548 n.3, 859 P.2d 51 (1993).

[4]CR 56(c).

[5]*Safeco Ins. Co. of America v. Butler*, 118 Wn.2d 383, 394–95, 823 P.2d 499 (1992).

inferences must be made in favor of the nonmoving party.[6] Viewing the facts in the light most favorably to Rosalie, we treat the lottery ticket as Elmer's acquisition and not a gift.

## ANALYSIS

Seizer argues that the trial court erred in determining as a matter of law that Washington law applies.

### Actual Conflict

█ We first determine whether Texas and Washington law actually conflict.[7] When the parties dispute choice of law, an actual conflict between the law of Washington and the law of another state must be shown to exist before Washington courts will engage in a conflict of laws analysis.[8] If the laws and interests of the concerned states do not conflict, we view the result as a "false" conflict or no conflict at all.[9] In the absence of a conflict, the forum applies its own law.[10]

█ Texas law differs from Washington law. Under Washington's separate and apart statute, after a marriage becomes defunct, earnings and accumulations are the acquiring spouse's separate property.[11] A marriage is considered defunct when both parties to the marriage no

---

[6]*Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982).

[7]*See Lauritzen v. Lauritzen*, 74 Wn. App. 432, 436–37, 874 P.2d 861, *review denied*, 125 Wn.2d 1006 (1994).

[8]*Burnside v. Simpson Paper Co.*., 123 Wn.2d 93, 103, 864 P.2d 937 (1994); *see also Rice v. Dow Chem. Co.*., 124 Wn.2d 205, 875 P.2d 1213 (1994).

[9]*Simpson*, 123 Wn.2d at 100 n.3.

[10]*Simpson*, 123 Wn.2d at 104; *see also Stamp v. Department of Labor & Indus.*, 122 Wn.2d 536, 540, 859 P.2d 597 (1993).

[11]RCW 26.16.140; *Aetna Life Ins. Co. v Bunt*, 110 Wn.2d 368, 372, 754 P.2d 993 (1988) (under the exception in RCW 26.16.140, a spouse's earnings are his or her separate property when the husband and wife are separated and the marriage is defunct) (citing *Rustad v. Rustad*, 61 Wn.2d 176, 180, 377 P.2d 414 (1963)); *In re Marriage of Short*, 125 Wn.2d 865, 871, 890 P.2d 12 (1995).

longer have the will to continue the marital relationship.[12] A finding that a marriage is defunct will defeat the presumption that all property acquired during marriage is community property.[13]

The Family Code of Texas does not treat marriages as defunct even if the spouses live separate and apart. Once a marriage exists, under Texas law, it is terminated only by death or court decree.[14] Under Texas law, the first spouse and the subsequent putative spouse each has an interest in assets acquired by the twice–married spouse.[15]

The differences in Washington and Texas law lead to differing results in this case. Under Washington law, if the trial court found the marriage defunct,[16] Rosalie would have no interest in the lottery proceeds since Elmer acquired this asset after their separation, and Elmer could freely dispose of his separate property by designating Barbara as his beneficiary. Under Texas law, if Rosalie demonstrates that Elmer did not obtain a divorce, she would recover one–quarter of the lottery proceeds.[17] Under Texas law, Barbara would be entitled to half of the community property acquired by herself and Elmer plus a further one–quarter as Elmer's beneficiary if she proves that she innocently entered into a valid marriage with Elmer with no knowledge of his pre–existing marriage.[18]

Thus, a different result occurs depending on whether

---

[12]*Short*, 125 Wn.2d at 871; *In re Marriage of Nuss*, 65 Wn. App. 334, 344, 828 P.2d 627 (1992); *see also Oil Heat Co. of Port Angeles, Inc. v. Sweeney*, 26 Wn. App. 351, 354, 613 P.2d 169 (1980).

[13]*See Aetna Life Ins.*, 110 Wn.2d at 372; *see* RCW 26.16.140 ("When a husband and wife are living separate and apart, their respective earnings and accumulations shall be the separate property of each.").

[14]*Estate of Claveria v. Claveria*, 615 S.W.2d 164, 167 (Tex. 1981).

[15]*Caruso v. Lucius*, 448 S.W.2d 711, 712 n.1 (Tex. Ct. App. 1970).

[16]Seizer also appeals the trial court's ruling that the marriage was defunct. We do not reach this issue.

[17]In Sessions's complaint, she only seeks her interest in the lottery proceeds, not the rest of Elmer's assets.

[18]*See Caruso*, 448 S.W.2d at 712 n.1.

Washington or Texas law applies. Additionally, as discussed below, the laws of Texas and Washington reflect each state's different interest in resolving community property questions after a lengthy separation of a married couple.

Barbara argues that a false conflict exists because she gave the lottery proceeds to Elmer and because Washington and Texas both treat gifts as separate property. Under Washington law, if proven by clear and convincing evidence, a gift to one spouse is separate property.[19] Texas law is similar, a gift acquired during marriage is separate property.[20] Thus, the Washington and Texas community property laws relating to gifts do not conflict.

We reject Barbara's argument for two reasons. First, the parties dispute who purchased the winning ticket. Even assuming we could decide that Barbara purchased the ticket, the record does not contain conclusive information about the source of the funds—Elmer's or Barbara's—used to purchase the ticket. We do not grant summary judgment when issues of material fact remain.[21] Second, and more importantly, Washington and Texas law do not similarly resolve how to divide assets acquired after a married couple's long-term separation. This difference extends to determining the interest in assets purchased

---

[19]*In re Marriage of Olivares*, 69 Wn. App. 324, 331, 848 P.2d 1281, *review denied*, 122 Wn.2d 1009 (1993); RCW 26.16.010.

[20]Tex. Const. art. XVI, § 15; TEX. FAM. CODE ANN. § 5.01(a)(2) (Vernon Supp. 1993); *Pankhurst v. Weitinger & Tucker*, 850 S.W.2d 726, 729–30 (Tex. Ct. App. 1993).

[21]CR 56(c).

and gifted between putative spouses. We conclude that there remains an actual conflict of law.[22]

Significant Relationship Rule

Since an actual conflict in laws exists that could lead to differing results, we proceed to decide which state's law applies.

■ Washington state has adopted the "most significant relationship rule" as developed by the Restatement (Second) of Conflict of Laws.[23] Section 6 of the Restatement sets forth seven factors relevant to a determination of the state having the most significant relationship to the issue:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

---

[22]The parties have not briefed another possible conflict between Texas and Washington law. Under Washington law, marriage is prohibited where one has a spouse still living, RCW 26.04.020, and a second marriage under these circumstances is void ab initio. *In re Englund's Estate*, 45 Wn.2d 708, 711, 277 P.2d 717 (1954); *see also* RCW 26.09.040(4)(b)(i). We decline to address this issue because the parties failed to raise it and because we decide in this opinion that Texas law governs.

[23]*Johnson v. Spider Staging Corp.*, 87 Wn.2d 577, 580, 555 P.2d 997 (1976); *Burnside*, 123 Wn.2d at 100; *Werner v. Werner*, 84 Wn.2d 360, 368, 526 P.2d 370 (1974); *Baffin Land Corp. v. Monticello Motor Inn, Inc.*, 70 Wn.2d 893, 899–900, 425 P.2d 623 (1967).

(g) ease in the determination and application of the law to be applied.[24]

These factors are not exclusive, and the respective importance of the factors varies with the particular issue at hand.[25]

■ The Restatement provides additional rules to guide application of the section 6 factors to particular situations. The rule governing this case is section 258 of the Restatement, dealing with interests in assets acquired after marriage:

(1) The interest of a spouse in a movable acquired by the other spouse during the marriage is determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the spouses and the movable under the principles stated in § 6.

(2) In the absence of an effective choice of law by the spouses, greater weight will usually be given to the state where the spouses were domiciled at the time the movable was acquired than to any other contact in determining the state of the applicable law.

The Supreme Court has applied section 258 to characterize a military pension acquired while the couple lived in community property states at times and in noncommunity property states at other times.[26] The comments to section 258 state that the most important section 6 factor in this context is implementation of the relevant policies of the state with the dominant interest in the transaction.[27]

We adopt section 258 to decide which state's law governs

---

[24]Restatement (Second) of Conflict of Laws § 6(2).

[25]Restatement § 6, comment c.

[26]In re Marriage of Landry, 103 Wn.2d 807, 810–11, 699 P.2d 214 (1985).

[27]Restatement § 258, comment b.

Rosalie's and Elmer's interests in the lottery proceeds, and proceed to an analysis of the section 6 factors.[28]

## A. Needs of the Interstate and International Systems

The drafters' comments state that this first factor of section 6 encourages courts to "seek to further harmonious relations between states and to facilitate commercial intercourse between them."[29] This factor has little or no bearing on the issue in this case. Neither Texas nor Washington has a need or policy to harbor persons who abandon their spouses in other states. Any rule we adopt in this case is unlikely to influence commercial intercourse between states.

## B. Relevant Policies of the Forum

The drafters' comments to section 258 direct the court to give particular attention to the second and third factors listed in section 6, the relevant policies of the interested states:

> Of the factors listed in Subsection (2) of § 6, that which is of particular importance in the present context is the one which calls for implementation of the relevant policies of the state with the dominant interest in the determination of the particular issue.[30]

Both Washington and Texas are community property states, with similar law relating to community property. Under the laws of both states, property acquired during

---

[28]Section 258(1). Relying on contract and tort cases such as *Baffin*, 70 Wn.2d at 900–01 and *Werner*, 84 Wn.2d at 368, Seizer argues that the first step is to analyze the various contacts of the parties to the interested states. Sections 258 and 6 do not require us to calculate the number of contacts with each jurisdiction.

[29]RESTATEMENT § 6, comment *d*.

[30]RESTATEMENT § 258, comment *b*.

marriage is presumed to be community property.[31] But the precise issue in this case turns, not so much on community property law, as on nature of the marital relationship and the duration of the community property presumption. The laws of Washington and Texas spring from different views of the nature of marriage, and we find this difference significant to this case.

Washington law has regarded marriage as a "civil contract" from the earliest territorial days.[32] Our Supreme Court has interpreted this statute to mean that marriage is governed by civil law, rather than ecclesiastical law.[33] The Legislature significantly modified Washington's marital laws when it enacted the Dissolution Act of 1973, which eliminated "fault" as a ground for divorce, and required the courts to dissolve a marriage upon the allegation that "the marriage is irretrievably broken . . . ."[34] Under the 1973 Act, "[t]he determination to dissolve a marriage rests with the spouses, not with the state."[35] Professor Rieke points out that the 1973 Act also changed the role of the parties, giving them a much larger role in negotiating the economic aspects of the dissolution of their marriage, much as contracting parties can negotiate the end of a contract.[36]

Even before the 1973 Act, Washington's "separate and apart" statute, RCW 26.16.140, allowed parties to end the community property aspects of their marriage by living separate and apart. This statute reflects the important

---

[31]Compare TEX. FAM. CODE. ANN., § 5.02 and Parkhurst, 850 S.W.2d at 729–30, with RCW 26.16.030 and In re Estate of Smith, 73 Wn.2d 629, 631, 440 P.2d 179 (1968) (clear and convincing evidence required to rebut presumption of community property).

[32]RCW 26.04.010; Luvern V. Rieke, The Dissolution Act of 1973: From Status to Contract?, 49 WASH. L. REV. 375 (1974) (quoting [1854] Wash. Sess. Laws 404 § 1).

[33]Washington Statewide Org. of Stepparents v. Smith, 85 Wn.2d 564, 569, 536 P.2d 1202 (1975).

[34]RCW 26.09.030(1).

[35]Rieke, supra, 49 WASH. L. REV. at 378.

[36]49 WASH. L. REV. at 378, 393–95.

policy of Washington State community property law that only accumulations produced by community effort should be considered community property.[37] Our courts have held that the separate and apart statute applies to "defunct marriages." It appears that the separate and apart status can be invoked only by the consent of both spouses. Professor Harry Cross has observed that

> [I]t is possible that the permanent separation or defunct marriage needed to invoke application of the statute requires concurrence of both spouse in the determination to go their separate ways, at least to protect the deserted spouse's claim against the individual acquisitions of the deserter.[38]

The Supreme Court has adopted Professor Cross's conclusion:

> [W]hen the deserted spouse accepts the futility of hope for restoration of a normal marital relationship, or *just acquiesces* in the separation, the marriage is considered "defunct" so that the "living separate and apart" statutes applies.[39]

The significant point for our purposes is that under

---

[37]*Cf. Togliatti v. Robertson*, 29 Wn.2d 844, 852, 190 P.2d 575 (1948); *Bunt*, 110 Wn.2d 872. *See also MacKenzie v. Sellner*, 58 Wn.2d 101, 105, 361 P.2d 165 (1961) ("The whole theory of community property is that it is obtained by the efforts of the husband or wife, or both, for the benefit of the community.").

[38]Harry M. Cross, *Equality for Spouses in Washington Community Property Law—1972 Statutory Changes*, 48 WASH. L. REV. 527, 533 (1973).

Washington case law indirectly supports the proposition that the deserted spouse must concur that the marriage is defunct. *Cf. Yates v. Dohring*, 24 Wn.2d 877, 881, 168 P.2d 404 (1946) (debt case) ("One who stands ready and willing to discharge one's marital obligations in full, will not have one's rights extinguished by the acts of the other.") Courts routinely describe the rule of law as involving *both* parties evidencing an intent to renounce the marriage. *E.g. MacKenzie*, 58 Wn.2d at 105 ("[W]here the spouses, by their conduct, indicate that they no longer have a will to union, then neither may reap the benefits of the community property law.") In the cases where courts have found that the marriage was defunct, the facts generally involve situations where *both* parties have demonstrated that the marriage is over. *E.g., Aetna Life Ins.*, 110 Wn.2d at 373 (separation petition); *MacKenzie*, 58 Wn.2d at 105–06 (parties reached property settlement); *In re Armstrong's Estate*, 33 Wn.2d 118, 120, 204 P.2d 500 (1949) (interlocutory divorce) *Togliatti*, 29 Wn.2d 845 (interlocutory decree); *see also Peters v. Skalman*, 27 Wn. App 247, 253, 617 P.2d 448, *review denied*, 94 Wn.2d 1025 (1980).

[39]*Short*, 125 Wn.2d at 871 (citing Harry M. Cross, *Community Property Law in Washington* (Rev. 1985), 61 WASH. L. REV. 13, 35 (1986)) (emphasis added).

Washington law, the spouses by mutual consent can terminate the marriage, or can mutually treat the community property presumptions as terminated by agreeing to live separate and apart.

## C. Relevant Policies of Other Interested State and the Relative Interests of That State in the Determination of the Particular Issue

Texas does not have a "separate and apart" statute. To the contrary, its settled law favors the sanctity of the marital relationship.[40] As one Texas court stated, "[t]he institution of marriage is a status, more than a mere contract, and has been defined as the voluntary union for life of one man and one woman as husband and wife, to the exclusion of all others."[41] Under Texas law, even if the spouses have been separated for great lengths of time and even if one spouse has remarried without divorcing, the first spouse still may recover a portion of the decedent's estate:

> Under Texas law, where one spouse of a prior marriage enters into a second marriage with an innocent party . . . . the properties acquired during the second, putative marriage relationship, by the putative spouses are half owned by the second putative spouse, and the other one–half of those properties are owned in equal one–quarter parts by the prior spouse and by the twice–married spouse.[42]

In *Caruso v. Lucius*, after a separation of almost 50 years from her twice–married husband, the court found Teresa Caruso entitled to recover her undivided one–fourth interest in the community property acquired dur-

---

[40]*See Simpson v. Simpson*, 380 S.W.2d 855, 858 (Tex. Ct. App. 1964); *see also* 380 S.W.2d at 856 ("Marriage [is] said to be of divine origin. . . .") (footnote omitted).

[41]*Simpson*, 380 S.W.2d at 858.

[42]*Caruso*, 448 S.W.2d at 712 n.1. *See Davis v. Davis*, 521 S.W.2d 603 (Tex. 1975) (putative wife one–half and lawful wife one–quarter). *See generally* Annotation, *Rights in Decedent's Estates As Between Lawful and Putative Spouses*, 81 A.L.R.3D 6, 34–37 (1977) (Texas cases).

ing the duration of her marriage relationship to her husband Pasquale.[43] Teresa and Pasquale were married in 1913 in Italy, Pasquale moved to the United States in 1917 and entered into a common law marriage to Arcelia Lucius in 1925. Pasquale died in 1966 without ever divorcing his first wife Teresa.[44] The jury found that Arcelia was an innocent party to the marriage and therefore was a putative spouse. The court held that Teresa was entitled to her undivided one–fourth interest in the properties by upholding the jury's finding that Teresa and Pasquale had never divorced. Teresa presented testimony of statements made by Pasquale that suggested he had never divorced her and she also produced evidence of the absence of divorce or annulment records from the necessary jurisdictions.[45]

Texas law strongly presumes that a second marriage is valid unless rebutted by evidence that the first marriage was not terminated.[46] For the purposes of this action, Sessions does not dispute that Elmer did not divorce Rosalie, and Seizer does not contest that Elmer and Barbara were married.[47]

Thus, under Washington law, the spouses may agree, explicitly or implicitly, to treat their marriage as defunct

---

[43]*Caruso*, 448 S.W.2d at 712–13.

[44]*Caruso*, 448 S.W.2d at 712–13.

[45]*Caruso*, 448 S.W.2d at 714–15. Under Texas law, evidence of the absence of divorce or annulment records in the official records were they should be found, rebuts the strong presumption of the termination of a prior marriage, where a second marriage has been entered into by one of the parties. *Caruso*, 448 S.W.2d at 715. The prior spouse is not required to look to every jurisdiction where a proceeding might be possible be, but look to jurisdictions where a divorce proceeding might be reasonably expected to have taken place. *Caruso*, 448 S.W.2d at 715 (citing *Dockery v. Brown*, 209 S.W.2d 801 (Tex. Ct. App. 1947)), no writ).

[46]*Simpson*, 380 S.W.2d at 858; *Caruso*, 448 S.W.2d at 714 (citing *Texas Employer's Ins. Ass'n v. Elder*, 282 S.W.2d 371 (Tex. 1955)). *See also Davis*, 521 S.W.2d at 605.

[47]Barbara cannot find documentation of their marriage, which allegedly took place in Tijuana. She believed that she was married, and Elmer and Barbara held themselves out as married. We leave to the trial court to determine if Barbara is a putative spouse under Texas law.

and the community property presumption at an end, but under Texas law the deserted spouse continues to enjoy marital status and is entitled to an interest in the future acquisitions of the deserting spouse.

Consideration of these relevant policies of the two interested states strongly favors the application of Texas law to this case. Texas was the last domicil of Elmer and Rosalie and remains Rosalie's home. Texas law does not permit Elmer to terminate the marital status without formal proceedings, and Texas has a strong interest in providing for the abandoned spouse, who is disabled. Although Washington allows spouses to agree to live separate and apart, Washington has no interest in allowing deserting spouses from other states to seek refuge under Washington's separate and apart statute. This is especially true where the abandoned spouse is mentally incompetent.

## D. Protection of Justified Expectations

The fourth factor under section 6 is the parties' justified expectations.[48] But the comment to section 258 cautions that,

> [i]n the normal situation, where the spouses have not reached agreement on an applicable law, protection of their justified expectations will have relatively little role to play in the choice of the applicable law.[49]

Nothing in this record suggests that Elmer and Rosalie agreed to apply Texas law or the law of any other state, and, given the circumstances of Elmer's departure, it seems unlikely they would have done so. If they had given the matter any thought, it seems that Elmer and Rosalie

---

[48]*Cf. Pacific Gamble Robinson Co. v. Lapp,* 95 Wn.2d 341, 348, 622 P.2d 850 (198) (analyzing expectations of parties in contract case involving community property or separate property issue); *Williams,* 76 Wn. App. at 247 (analyzing expectations in tort case). *See also Potlatch No. 1 Fed. Credit Union v. Kennedy,* 76 Wn.2d 806, 813–14, 459 P.2d 32 (1969).

[49]RESTATEMENT § 258, comment *b.*

could only have been justified in assuming that Texas law would apply. Elmer knew that Rosalie depended on her parents when he abandoned her in Texas, and that Rosalie and his daughter still lived in Texas.

Thus far we have considered only Elmer and Rosalie. Barbara would justifiably rely on Washington law since she resided in Washington and believed she had a valid Washington State marriage. But if Barbara had known of Elmer's first marriage, it would have been unreasonable for her to assume that Washington law—instead of Texas law—would apply to Elmer's first marriage. Accordingly, to the extent that we consider the factor of justified expectations, this factor favors the application of Texas law.

## E. Basic Policies Underlying the Particular Field of Law

The basic policy underlying the marital property laws of both Texas and Washington is to provide fairly and equitably for both spouses when the marriage terminates in separation, dissolution, or death. Texas law more fairly and equitably protects an abandoned spouse such as Rosalie.

## F. Other Considerations

We also consider certainty, predictability, and uniformity of result and the ease in the determination and the application of the law to be applied.

The most uniform and easiest rule would be the Restatement's general presumption that the law of the domicil will govern spousal ownership disputes in movable property.[50] More specifically, the Restatement generally calls for application of the law of the domicil of the acquiring spouse:

When the spouses have separate domiciles at the time of the

---

[50]RESTATEMENT § 258, comment *b*.

acquisition of the movable, the local law of the state where the spouse who acquired the movable was domiciled at the time will usually be applied, in the absence of an effective choice of law by the parties, to determine the extent of the other spouse's marital interest therein.[51]

We decline to apply this presumption in the case of an abandoned spouse. An abandoned spouse has no choice over the domicil chosen by the deserter, and we do not believe a deserting spouse should be able to change the law governing the marriage by leaving the home state of the marriage.

Despite the Restatement's presumption that the law of the domicil of the spouse acquiring the property will "usually" be applied, in the case of an abandoned spouse it is equally easy and much more fair to apply the law of the domicil of an abandoned spouse. A spouse who wishes to end all marital obligations can do so by initiating dissolution proceedings in the home state of the marriage, and should not be allowed to move to a different jurisdiction in search of more favorable marital property laws.

## CONCLUSION

After considering all relevant factors, we hold that Texas has the most significant relationship to the determination of ownership of Elmer's lottery proceeds. Accordingly, we reverse the summary judgment and remand for a determination of Rosalie's interest in the lottery proceeds under Texas law. If the trial court concludes that Rosalie might have an interest under Texas law, then the court must determine whether Elmer or Barbara purchased the winning ticket, whether the ticket was purchased with community or separate property, and how these facts affect Rosalie's interest in the ticket.

---

[51]RESTATEMENT § 258, comment c.

BRIDGEWATER, J., and FLEISHER, J. Pro Tem., concur.

Review granted at 130 Wn.2d 1001 (1996).