**Michigan Supreme Court**
**Lansing, Michigan 48909**



Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED JULY 23, 2003**

*In re* CAW,

_____

FAMILY INDEPENDENCE AGENCY,

    Petitioner-Appellant,

v                        No. 122790

LARRY HEIER,

    Appellee,

and

DEBORAH ANN WEBER AND ROBERT
RIVARD,

    Respondents.

_____

BEFORE THE ENTIRE COURT

TAYLOR, J.

This Court granted leave to appeal limited to the issue whether a putative father has standing to intervene in a child protective proceeding under the juvenile code[1] in which the

_____

[1]MCL 712A.1 *et seq.*

child involved has a legal father. The Court of Appeals determined that the putative father had standing. We reverse the decision of the Court of Appeals and hold that the putative father did not have standing to intervene. We remand to the Court of Appeals to consider appellee's remaining issues.

I

A child protective petition alleging abuse and neglect, brought pursuant to MCL 712A.2(b), was filed on July 31, 1998 on behalf of three minor children, including "CAW." The petition stated that Robert Rivard was the legal father of the children, but might not have been the biological father of "any or all of the children." In particular, on the issue of paternity, the petition indicated that "CAW" was the child of Larry "Hier."[2]

Accepting the petition's assertion that Heier's address was unknown, the court, to give Heier notice of the child protective proceedings scheduled for August 19, 1998, issued an order for alternative service by publication.[3]

At the August 19, 1998, hearing, at which Heier did not

---

[2]This is apparently a misspelling of Larry Heier's last name.

[3]The notice was published with two errors: Heier's name was misspelled in the same manner as in the petition, and the date of the hearing was incorrectly stated as August 9.

appear, the court decided that the children should remain in foster care. Later, at a pretrial conference on September 3, 1998, Rivard and Weber asserted that Rivard was the father of all three children. The court, after questioning Rivard and Weber, accepted this as fact and the petition was amended accordingly, including deleting any further reference to Heier. From this point on, the court and the parties in all proceedings referred to Rivard as the children's father.

In December 1999, well over a year later, progress toward reunification of the family was unsatisfactory. A petition was filed by the Family Independence Agency to terminate Rivard and Weber's parental rights pursuant to MCL 712A.19b.[4] The proceedings that ensued culminated in an order terminating Rivard and Weber's parental rights on November 13, 2000.

On January 25, 2001, Weber appealed the termination adjudication to the Court of Appeals.[5] At the same time, Heier filed a motion in the trial court seeking to intervene in the child protective proceeding concerning CAW. Heier

---

[4]Specifically, MCL 712A.19b(3)(a)(ii) (desertion, for Rivard only), (3)(c)(i) (conditions that led to adjudication continue to exist), (3)(g) (failure to provide proper care and custody), and (3)(j) (reasonable likelihood that the child will be harmed if returned to the parent's home).

[5]Rivard did not appeal the termination of his parental rights, and the Court of Appeals affirmed the termination of Weber's parental rights. *In re Weber*, *minors*, unpublished memorandum opinion, issued October 26, 2001 (Docket No. 232206).

alleged that he was the biological father of CAW and had standing on that basis. He also argued, in essence, that the trial court had failed to provide him with adequate notice of the child protective proceedings and that he was entitled to notice pursuant to the United States Constitution regardless of whether the statutes or court rules gave him standing. In asserting that claim, he gave the court factual information regarding his relationship with the child both before and during the child protective proceedings in support of his constitutional claims.

The trial court denied Heier's motion to intervene on the ground that Heier lacked standing because CAW had a legal father. The court reasoned:

> It is clear that you cannot have a legal father and a punitive [sic] father. In this case we did have a legal father. [CAW] was born-conceived and born during the marriage between Miss Weber and Mr. Rivard. There has never been any dispute whether he was or was not the legal father. . . . [It had been determined that (Rivard) was the legal father, and once that determination was made all proceedings were geared toward (Rivard's) rights to all three children.]

On appeal, Heier argued, and the Court of Appeals agreed, that the termination of Rivard's legal rights at the conclusion of the child protective proceeding was effectively a finding "by judicial notice or otherwise" that CAW was not the issue of the marriage. A divided panel of the Court of Appeals, agreeing only that it was troubling that the law

4

should be interpreted to mean that Heier had no opportunity to establish his paternity, reversed the order of the trial court. The majority held that there was standing under the juvenile code for putative fathers. 253 Mich App 629, 631; 659 NW2d 657 (2002). It reasoned that even though "Rivard may still meet one or several of the definitions listed for 'father' in MCR 5.903(A)(4)," because his rights were now terminated he no longer had any legal rights as father. 253 Mich App 640. This, the majority concluded, opened the door for the putative father to have standing to establish his paternity. *Id*. at 644. The Court, having resolved the matter favorably to Heier on the basis of the statute and court rules at issue, determined it unnecessary to deal with the constitutional issues Heier had raised. *Id*. at 633.

We granted leave to appeal limited to the issue whether a putative father has standing to intervene in a child protective proceeding under the juvenile code in which the subject child has a legal father.

II

This is a question involving the construction of a statute, which we review de novo. *Robertson v DaimlerChrysler Corp*, 465 Mich 732, 739; 641 NW2d 567 (2002).

III

In this matter, Larry Heier, claiming paternity of CAW,

5

sought to intervene in child protective proceedings brought pursuant to MCL 712A.2(b)(1) and (2).[6] Intervention in such a proceeding is controlled by MCR 5.921(D). This court rule states that a putative father is entitled to participate only "[i]f, at any time during the pendency of a proceeding, the court determines that the minor has no father as defined in MCR 5.903(A)(4) . . . ."

As relevant here, MCR 5.903(A) states:

> (A) ... When used in this subchapter, unless the context otherwise indicates:

> (1) "Child born out of wedlock" means a child conceived and born to a woman who is unmarried from the conception to the birth of the child, or a child determined by judicial notice or otherwise to have been conceived or born during a marriage but who is not the issue of that marriage.

---

[6]In relevant part, MCL 712A.2(b) gives the court jurisdiction in proceedings concerning a juvenile:

> (1) Whose parent or other person legally responsible for the care and maintenance of the juvenile, when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to a substantial risk of harm to his or her mental well-being, who is abandoned by his or her parents, guardian, or other custodian, or who is without proper custody or guardianship. . . .

> * * *

> (2) Whose home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, nonparent adult, or other custodian, is an unfit place for the juvenile to live in.

* * *

(4) "Father" means:

(a) a man married to the mother at any time from a minor's conception to the minor's birth unless the minor is determined to be a child born out of wedlock[.]

The essence of this rule is that a child has a father if his mother is married at any time during gestation unless the court determines "by judicial notice or otherwise" that the child was not "the issue of the marriage."

In this case, CAW had a married mother and father, Deborah Ann Weber and Robert Rivard, during the gestation period. Moreover, no finding was ever made by the court that CAW was not the issue of the marriage. The termination of Rivard's parental rights was not a determination that CAW was not the issue of the marriage and, thus, that Rivard was no longer his father; rather, it was only a determination that Rivard's legal rights were terminated. Thus, the requirements of the court rule to give Heier, a putative father, standing were not met.

Finally, in the Court of Appeals opinion, as well as the dissent, there is much angst about the perceived unfairness of not allowing Heier the opportunity to establish paternity. We are more comfortable with the law as currently written. There is much that benefits society and, in particular, the children of our state, by a legal regime that presumes the legitimacy

7

of children born during a marriage.  See *Serafin v Serafin*, 401 Mich 629, 636; 258 NW2d 461 (1977).  It is likely that these values, rather than failure to consider the plight of putative fathers who wish to invade marriages to assert paternity claims, motivated the drafters of the rules and statutes under consideration.

IV

We reverse the decision of the Court of Appeals because the circuit court properly denied Heier's motion to intervene. We remand to the Court of Appeals to address Heier's constitutional issues.

Clifford W. Taylor
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

*In re* CAW

_____

FAMILY INDEPENDENCE AGENCY,

    Petitioner-Appellant,

v                                                          No.  122790

LARRY HEIER,

    Appellee,

and

DEBORAH ANN WEBER AND ROBERT
RIVARD,
    Respondents.

_____

WEAVER, J. (*concurring*).

    I concur in the majority's reversal of the decision of the Court of Appeals.  Larry Heier, the putative father, does not have standing to intervene in this child protective proceeding because there is no previous determination by the circuit court that CAW was born out of wedlock.  I write separately because the majority's statement that it is "more comfortable with the law as currently written," *ante* at 8, lacks any force in the resolution of this case. Consideration and rejection of the Court of Appeals reasoning provides a

better approach to, and context for, understanding why a putative father does not have standing to intervene in a child protective proceeding unless the circuit court has previously determined that the child was born out of wedlock.

The juvenile-code provisions addressing child protective proceedings do not list putative fathers among the individuals who must be served with notice.[1] The Michigan Court Rules, however, do afford the court the discretion under defined circumstances to order that notice be served on a putative father. MCR 5.921(D) provides, "[i]f, at any time during the pendency of a proceeding, the court determines that the minor has no father as defined in MCR 5.903(A)(4), the court may, in its discretion, take appropriate action as described in this subrule."[2]

A threshold requirement of MCR 5.291(D), before notice may be served on a putative father, is a determination by the

---

[1]MCL 712A.19(5) and MCL 712A.19b(2).

[2]If it is determined that the minor child has no "father" as that term is defined by the court rules, then MCR 5.921(D)(1) provides:

> The court may take initial testimony on the tentative identity and address of the natural father. If the court finds probable cause to believe that an identifiable person is the natural father of the minor, the court shall direct that notice be served on that person . . . .

court that the minor has no father as defined by MCR 5.903(A)(4). In pertinent part, MCR 5.903(A)(4) defines a "father" as "a man married to the mother at any time from a minor's conception to birth unless the minor is determined to be a child born out of wedlock . . . ." MCR 5.903(A)(1) defines a "child born out of wedlock" as

> a child conceived and born to a woman who is unmarried from the conception to the birth of the child, or a child determined by judicial notice or otherwise to have been conceived or born during a marriage but who is not the issue of that marriage.

This Court has not addressed the standing of a putative father in light of this court rule.

In *Girard v Wagenmaker*, 437 Mich 231, 242-243; 470 NW2d 372 (1991), however, this Court interpreted a similarly worded definition of "child born out of wedlock" to determine whether, and when, a putative father had standing to file a complaint pursuant to Michigan's Paternity Act, MCL 722.711 *et seq*. The act defines in part "child born out of wedlock" as a child that "the court has determined to be a child born or conceived during a marriage but not an issue of that marriage." MCL 722.711(a). *Girard, supra* at 242 (citations omitted) reasoned:

> "[H]as determined" is the present perfect tense of the verb "determine." The present perfect tense generally "indicates action that was started in the past and has recently been completed or is continuing up to the present time" . . . .

3

*Girard* held that, under the plain terms of the Paternity Act, a putative father did not have standing "to establish paternity of a child born while the mother was legally married to another man without a prior determination that the mother's husband is not the father." *Girard, supra* at 235. *Girard* grounded its literal reading of the statute in the fact that it comported with "the traditional preference for respecting the presumed legitimacy of a child born during marriage." *Id.* at 246, citing *Serafin v Serafin*, 401 Mich 629, 636; 258 NW2d 461 (1977).

The majority of the Court of Appeals attempted to distinguish *Girard,* concluding that the definition of "child born out of wedlock" in MCR 5.903 is "less restrictive" than the Paternity Act definition. 253 Mich App 637. However, the definition of "child born out of wedlock" in MCR 5.903(A)(1) varies from the definition of the same term in the Paternity Act only in its additional provision that a child may be determined to be born out of wedlock "by judicial notice or otherwise" and in its use of the past tense of the verb "to determine," rather than the present perfect tense of that verb.

The provision that the determination may be made by judicial notice does not affect when the determination must be made in order to permit standing. Moreover, the use of the

4

past tense makes even clearer the fact that the determination must be made by the court *before* a putative father may be accorded standing in a child protective proceeding. Because Weber was married to Rivard from the time of conception to the birth of CAW, and because CAW was not "determined by judicial notice or otherwise to have been conceived or born during a marriage but . . . not the issue of that marriage" pursuant to MCR 5.903(A)(1),[3] the provisions for notice to a putative father in MCR 5.921(D) were not applicable.[4]

For these reasons, I concur in the result of the majority opinion. I also concur in the remand to the Court of Appeals to address Heier's argument that the standing requirements deny him due process of law by depriving him of an alleged established parental relationship with CAW.

Elizabeth A. Weaver

---

[3]Recent amendments to MCR 5.903, issued February 4, 2003, were effective May 1, 2003 as MCR 3.903.

[4]The Court of Appeals also premised its reversal of the family division of the circuit court's denial of Heier's motion to intervene in part on the termination of Rivard's parental rights. 253 Mich App 640. While purporting to rely on the court rules, the Court of Appeals majority actually contradicts them. The authority of the family division of the circuit court to determine the rights of a putative father derives from a determination that a child was born out of wedlock, not the termination of the legal father's rights.

5

*In re* CAW, minor,

_____

FAMILY INDEPENDENCE AGENCY,

    Petitioner-Appellant,

v                                               No. 122790

LARRY HEIER,

    Appellee,

and

DEBORAH ANN WEBER and ROBERT
RIVARD,

    Respondents.

_____

KELLY, J. (*concurring in part and dissenting in part*).

    I agree with the result reached by the majority in this case. However, I disagree with the majority's reliance on MCR 5.921(D). I also disagree with its glancing reliance on the policy underlying the Paternity Act[1] to support its decision.

_____

    [1]MCL 722.711 *et seq.*

## I. MCR 5.921(D) DOES NOT ADDRESS STANDING PER SE

The majority spends little time analyzing MCR 5.921 and makes no effort to address the rule's relation to the requirements for intervention. Nevertheless, it holds that MCR 5.921 controls whether Mr. Heier has standing in this case. This conclusion is erroneous.

In interpreting and applying court rules, we apply the standard rules of statutory construction. Accordingly, our primary purpose is to accurately interpret the meaning of the language of a rule. *Grievance Administrator v Underwood*, 462 Mich 188, 193-194; 612 NW2d 116 (2000).

Notably, the text of MCR 5.921 does not explicitly address standing to intervene. Rather, it designates the persons who must be given notice before child protective proceedings can go forward. In this respect, the rule is no different from others requiring notice be given to interested parties.

In general, notice is not required for persons who merely have an interest that might be affected by the outcome of the case. Rather, a person is allowed to intervene if (1) he timely claims an interest that is related to the subject of the proceedings, (2) the disposition of the action may impair his ability to protect his interest, and (3) his interest is inadequately represented by the existing parties. MCR 2.209.

2

However, in listing the categories of persons who require notice, MCR 5.921 does not state that all others are disallowed from inserting themselves into a termination dispute. Accordingly, I believe that the majority is incorrect in holding that the rule precluded Mr. Heier's intervention in this matter.

## II. THE MAJORITY'S POLICY ARGUMENT IS ILL-CONCEIVED

Although the majority rests its holding primarily on the notion that Mr. Heier's claims are barred by MCR 5.921(D), it has attempted to fortify its reasoning by alluding to public policy. It asserts that the public policy considerations underlying the enactment of the Paternity Act also underlie child protective proceedings. Again, I disagree.

The public policy objective of the Paternity Act is to ensure that all children are provided with support and education. *Crego v Coleman*, 463 Mich 248, 269; 615 NW2d 218 (2000), citing *Whybra v Gustafson*, 365 Mich 396, 400; 112 NW2d 503 (1961). The objective would be frustrated if a "legal" father were able to abandon his duty of support as the result of unfounded allegations of paternity. Hence, before an action can be sustained under the Paternity Act, a determination must be made that the child in question was born out of wedlock, MCL 722.711(a); *Girard v Wagenmaker*, 437 Mich 231; 470 NW2d 372 (1991).

3

By contrast, the purpose of termination proceedings under the juvenile code is to assure a child of care, guidance, and control conducive to his welfare and the interest of the state. MCL 712A.1(3). Accordingly, when a child is removed from his parents, the court must provide him with care that approximates the care his parents should have provided. *Id*. Thus, the two acts serve different masters. A person must not blindly assume that a single public policy consideration fulfills their distinct purposes.

Similarly, the majority's reliance on our opinion in *Serafin v Serafin*[2] is unsuited to this case. *Serafin* did not address the statutes or court rules at issue here. Instead, it held that Lord Mansfield's Rule, a common-law rule of evidence, was no longer viable in Michigan.

It is true that *Serafin* observed that children remain "guarded by [a] still viable and strong . . . presumption of legitimacy" that can be rebutted only by clear and convincing evidence. *Serafin*, 401 Mich 636, citing *Maxwell v Maxwell*, 15 Mich App 607, 617; 167 NW2d 114 (1969). Yet, *Serafin* goes on to rebuke a too dogged pursuit of the presumption of legitimacy rule:

> "If the function of a court is to find the truth of a matter so that justice might be done, then a rule which absolutely excludes the best

---

[2]401 Mich 629; 258 NW2d 461 (1977).

4

> possible evidence of a matter in issue rather than allow it to be weighed by the trier of fact must necessarily lead to injustice. Further, when a court voluntarily blindfolds itself to what every citizen can see, the public must justifiably question the administration of law to just that extent." [*Serafin*, *supra* at 635-636, quoting *Davis v Davis*, 507 SW2d 841, 847 (Tex Civ App, 1974), rev'd on other grounds 521 SW2d 603 (1975).]

In accordance with that rationale, I do not agree that the presumption of legitimacy rule has persuasive force in this case. Certainly, the majority would not advance the argument that this rule protects the sanctity of CAW's family unit. That proposition is absurd in the context of termination proceedings, the object of which is to *destroy* any familial bond between a child and the parent whose rights are being terminated.

Similarly, the policy cannot be advanced on the basis that it furthers the goals expressed in the juvenile code. Rigid application of the presumption of legitimacy would frustrate the code's preference for placing a child with his parent, if the parent is willing and able to care for him. For example, if Heier were a fit biological parent of CAW, rigid application of the presumption relied on by the majority would prevent the court from placing CAW with him.

### III. Resolution

Ultimately, the question here is whether the circuit court was correct in denying Mr. Heier's petition to

5

intervene.  The answer comes from a comprehensive reading of the relevant court rules.

MCR 5.901 provides:

> (A) Scope.  The rules in this subchapter, in subchapter 1.100 and in rule 5.113, govern practice and procedure in the family division of the circuit court in all cases filed under the Juvenile Code. Other Michigan Court Rules apply to such juvenile cases in the family division of the circuit court only when this subchapter specifically provides.
>
> (B) Application.  Unless the context otherwise indicates:
>
> (1) MCR 5.901-5.927, 5.980 and 5.991-5.993 apply to delinquency proceedings and child protective proceedings;
>
> * * *
>
> (4) MCR 5.961-5.974 apply only to child protective proceedings[.]

None of these provisions permits intervention in child protective proceedings.  Nor does any of them reference another court rule that permits it.  But, in the end, Mr. Heier can identify no court rule under which he could intervene and, as a consequence, the trial court was required to deny his motion.

## IV. CONCLUSION

While, applying the court rules, the trial court did not err in denying Mr. Heier's motion to intervene in the child protective proceedings, I am troubled by the result.

I believe our court rules should be amended to allow a

6

putative father to intervene in a child protective proceeding if he is able to raise a legitimate question about paternity.[3] DNA testing now can determine paternity with relative ease, speed, and accuracy. The juvenile code presumes that a child's interests are best served when he is in the care of a fit parent. These considerations support a rule change and would give putative fathers the opportunity for a fair hearing in the future.

Marilyn Kelly

---

[3]I recognize that it may be necessary for the Legislature to amend the juvenile code to allow intervention in these proceedings. Accordingly, to the extent necessary, I would also solicit the Legislature to amend the juvenile code to provide for such intervention.

*In re* CAW,

_____/

FAMILY INDEPENDENCE AGENCY,

    Petitioner-Appellant,

v                                              No. 122790

LARRY HEIER,

    Appellee,

and

DEBORAH ANN WEBER and ROBERT RIVARD,

    Respondents.

_____

CAVANAGH, J. (*dissenting*).

Because I disagree with the majority's conclusion that our court rule deprives the putative father of standing to intervene, I must respectfully dissent. I would hold, for the reasons stated in my dissent in *Girard v Wagenmaker*, 437 Mich 231, 253-278; 470 NW2d 372 (1991), that the Legislature intended to allow putative fathers an opportunity to intervene

1

in child protective proceedings. Hence, the majority errs by applying MCR 5.921(D) in a manner that prohibits standing.

As stated in my *Girard* dissent, nothing in our statutes or court rules compels the conclusion that a putative father must first establish paternity in a separate legal proceeding. To so hold perpetuates the errors caused by the majority's position in *Girard*, while denying parents the right to develop and maintain relationships with their children.

Though my position in *Girard* adequately rebuffs the majority's decision today, one need not focus exclusively on the rights of the putative father; the child's rights also demand this result.[1] Courts making paternity and custody determinations have the authority to inquire about a child's putative father or parent in fact. Without it, a court would be deprived of the means necessary to ensure that a child's best interests and due-process rights are protected.

------

[1] See, e.g., *In re Doe,* 254 Ill App 3d 405, 410-411; 627 NE2d 648 (1993):

> Fortunately, the time has long past when children in our society were considered the property of their parents. Slowly, but finally, when it comes to children even the law has rid itself of the Dred Scott mentality that a human being can be considered a piece of property "belonging" to another human being. To hold that a child is the property of his parents is to deny the humanity of the child. Thus, in the present case we start with the premise that . . . [the child] "belongs" to no one but himself.

Few would disagree that an extremely self-reflective and understanding legal father could process feelings of rejection, anger, or betrayal while continuing to lovingly nurture a child sired by another man. However, the majority assumes that all legal fathers have that extraordinary capacity and that the presence of putative fathers in their children's lives would, in no way, prove beneficial if paternity had not been established at an earlier legal proceeding.

For these reasons, I must respectfully dissent.

Michael F. Cavanagh